UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

LAWRENCE STACKHOUSE,

                Plaintiff,

vs                                        Civil Number 09-839 (PJS/JSM)

UNITED STATES, ET AL.,

                Defendants.

### Declaration of Shelley Stanton, M.D.

Pursuant to the provisions of 28 U.S.C. Section 1746, I declare that the following facts are true and correct:

1. I am employed by the United States Department of Justice (USDOJ) and the Federal Bureau of Prisons (BOP) at the Federal Medical Center (FMC) located in Rochester, Minnesota. I am a licensed physician. I currently am employed as the Chief of Psychiatry for the FMC. Prior to assuming my current position, I was employed as the Clinical Director for the FMC from October 15, 2006, to January 17, 2009. I have access to files and records maintained by the BOP for inmates. True and accurate copies of records maintained by the BOP that concern the plaintiff are attached to my declaration.

2. During the time frame I was the Clinical Director for the FMC, I was responsible for general supervision of the physicians and physician's assistants (PA) who worked at the FMC. I had general responsibility for supervising defendants Tran and Sullivan. I relied upon them to provide proper care for inmates according to the primary care provider team concept for delivery of patient medical care outlined in applicable BOP policies. Under the primary care provider team model utilized by the BOP for delivery of medical care to inmates, an inmate is assigned to a medical team of health care providers and support staff who are responsible for managing the inmate's health care needs.

3. The plaintiff was confined at the FMC from May 2, 2006, to March 17, 2009. Because I did not assume my duties as Clinical Director until October 15, 2006, I was not responsible for general supervision of defendants Tran and Sullivan prior to October 15, 2006. Thus, I had no personal involvement in the plaintiff's care and treatment for colitis during the time frame from May 2, 2006, to October 14, 2006, and I was never aware of any deliberate indifference to his need for treatment of colitis by defendants Tran and Sullivan during this time frame.

4. When inmates confined at the FMC required specialized medical care and treatment during

1

the time frame I served as the Clinical Director for the FMC, the BOP obtained such services from employees working for the Mayo Clinic (Mayo) pursuant to a contractual agreement. The employees who work for the Mayo and provide care for inmates confined at the FMC are independent contractors rather than federal employees. I never exercised any direct control over the clinical judgment of Mayo employees who provided specialized medical care and treatment for the plaintiff while he was confined at the FMC.

5. During my tenure as the Clinical Director for the FMC, the BOP also obtained medical care services from independent contractor physicians employed with National Emergency Services (NES). Employees of NES provided part time physician coverage for the FMC when federal employee physicians were unavailable to provide care for inmates. The employees who work for the NES are independent contractors rather than federal employees. I never exercised any direct control over the clinical judgment of NES employees who provided care and treatment for the plaintiff while he was confined at the FMC.

6. The plaintiff was transferred to the FMC for an evaluation and treatment of inflammatory bowel disease after a surgical pathology report obtained prior to his transfer to the FMC revealed he had colitis. This condition apparently developed after the plaintiff packed tobacco into a latex glove finger or container and he inserted the tobacco into his rectum in October 2005. The plaintiff was unable to expel or defecate all the tobacco. See **Attachment A**. He experienced bowel problems after that time even though there was no family history of inflammatory bowel disease in his family. He did report a family history of sickle cell disease a/k/a sickle cell anemia. The sickle cell disease is a hereditary hemolytic anemia characterized by joint pain, acute attacks of abdominal pain, ulcerations of the lower extremities, sickle-shaped erythrocytes in the blood and the presence of S hemoglobin in red blood cells.

7. Prednisone is a synthetic glucocorticoid derived from cortisone that is used to treat inflammation. The suggested dosage ranges from 5-60 milligrams per day depending upon the disease being treated and other factors. The initial dose is to be maintained until a satisfactory response is noted and then the dosage is to be reduced in small increments at appropriate time intervals until the lowest dose necessary to maintain an adequate clinical response is reached. If use of the drug is stopped after it is used for long term therapy, a gradual reduction or tapering of the drug is recommended.

8. Prednisone may be used to treat gastrointestinal diseases such as ulcerative colitis. However, the drug may cause serious side effects that include cataracts, glaucoma with possible damage to optic nerves as well as masking signs of infections or the onset of infections. Additional side effects of prednisone include psychic derangements and exacerbation of emotional instability or psychotic tendencies. When used as a treatment for ulcerative colitis, medical care providers are advised to use caution due to the probability of impending perforation, abscess or other pyogenic infection, diverticulitis, fresh intestinal anastomoses, active or latent peptic ulcer, renal insufficiency, hypertension, osteoporosis and myasthenia gravis (muscle weakness). Because side effects of treatment are related to the patient's response to the prescribed dose and the

duration of treatment, physicians are instructed to conduct a risk/benefit analysis for each patient to determine the appropriate dose and length of treatment.

9. The plaintiff's medical records establish that he received prednisone to treat colitis prior to his transfer to the FMC, but the prescription for prednisone was scheduled to end on May 4, 2006. See **Attachment B**. The plaintiff was provided with azathioprine (a/k/a Asacol) and prednisone by Dr. Victor Loranth while he was confined at the Federal Correctional Institution (FCI) in Williamsburg, South Carolina, on March 30, 2006. Dr. Loranth tapered the dose of prednisone, and the prescription ended on May 4, 2006. The plaintiff's records note that his condition was assessed when he arrived at the FMC on May 2, 2006, and he reported that he had lost 30 pounds prior to his transfer to the FMC. See **Attachment C**. When the plaintiff's general history report was prepared at the FMC on May 4, 2006, NES physician Richard Ashley did not prescribe any additional prednisone for the plaintiff. He assessed the plaintiff's condition as stable and healthy at that time. See **Attachment C**.

10. The plaintiff's medical records note that he received maintenance treatment with sulfasalazine and ranitidine when his history and physical exam was conducted at the FMC on May 4, 2006. Sulfasalazine is commonly prescribed as maintenance therapy for treatment of mild to moderate ulcerative colitis. Ranitidine is commonly prescribed as maintenance therapy for treatment of a duodenal or gastric ulcer to prevent recurrence. Dr. Tran first met with the plaintiff on May 9, 2006. He conducted a comprehensive review of the plaintiff's history, and he noted that the plaintiff's symptoms had slightly improved. He ordered laboratory tests and an abdominal X-ray to assess the plaintiff's condition. He continued treatment with sulfasalazine and ranitidine and also prescribed flagyl and loperamide. Flagyl is commonly prescribed to treat abdominal infections and loperamide is prescribed to control diarrhea. See **Attachment D**.

11. Dr. Tran did not prescribe prednisone on May 9, 2006, but he did request an evaluation by a Mayo specialist on May 9, 2006. The request for a consultation with a Mayo specialist was approved by former FMC Clinical Director David Edwardy on May 16, 2006. See **Attachment E**. Although the plaintiff did not receive prednisone, his medical records establish that on June 7, 2006, his weight had increased to 205 pounds, and he did not report that there was any blood in his stools. He did notify employees that there was blood in his stools on July 3, 2006, and a prescription for loperamide was refilled at that time. On July 10, 2006, the plaintiff advised an employee that he had experienced episodes of vomiting, but he also reported that he had prednisone stored in his property, and he had been taking it for approximately one week and he felt better. See **Attachment F**.

12. Even though Dr. Tran's request for a consult by a Mayo specialist was approved, Mayo specialists are independent contractors who also provide care and treatment for regular patients in the community in addition to inmates confined at the FMC. The Mayo specialists establish the dates and times when they are available to provide care for inmates confined at the FMC. The plaintiff's condition was initially evaluated by Mayo specialist Dr. Patrick Kamath on July 11, 2006. During his meeting with Dr. Kamath, the plaintiff stated he had 30-40 bowel movements

3

per day, he lost 38 pounds since the onset of his symptoms, he had low grade fever and he suffered from generalized abdominal pain. Dr. Kamath recommended treatment with prednisone (40 mg per day) and continued treatment with sulfasalazine. See **Attachment G**. Dr. Kamath also recommended a colonoscopy with biopsy procedure.

13. In the report he prepared for the July 11, 2006, evaluation, Dr. Kamath noted that the plaintiff had self-medicated himself with prednisone daily without much improvement after his symptoms worsened after he was transferred to the FMC. In addition, Dr. Kamath also expressed concern about whether the plaintiff's condition involved other forms of colitis such as C. difficile or CMV colitis. Dr. Kamath noted that the symptoms reported by the plaintiff seemed disproportionate to the previous colonoscopy findings obtained while he was confined at FCI Williamsburg. He advised the plaintiff of the importance of discerning the nature and extent of the disease. Even though the plaintiff told Dr. Kamath he was unhappy with the care he had received at the FMC, Dr. Kamath did not note in his report any deficiencies in the care provided by Dr. Tran or any other FMC employees. See **Attachment G**.

14. Following the evaluation by Dr. Kamath, Dr. Tran prepared progress note entries on July 13, 2006, and on July 18, 2006. In his entries, Dr. Tran noted that prednisone was not prescribed after the plaintiff was transferred to the FMC because the plaintiff had already received an intensive dose of prednisone prior to his transfer to the FMC and because there was still uncertainty about the plaintiff's diagnosis. See **Attachment H**. In his July 18, 2006, entry, Dr. Tran also noted that the plaintiff had been advised to resume treatment with prednisone following his evaluation by Dr. Kamath; however, the plaintiff consumed an excessive dose of prednisone and subsequently experienced prednisone related psychosis. Dr. Tran noted that the plaintiff was prescribed prednisone (40 mg) as well as ferrous gluconate, loperamide, ranitide and sulfasalazine. See **Attachment H**.

15. Dr. Tran submitted another request for a consult by a Mayo specialist on September 18, 2006, after the colonoscopy with biopsy procedure recommended by Dr. Kamath was conducted by a Mayo specialist on August 24, 2006. The results of the biopsy established that the plaintiff had mild to moderate colitis. Dr. Tran prepared a progress note entry on September 18, 2006, in which he noted that the plaintiff was in excellent physical condition and he no longer used loperamide. After outlining the results of some of the plaintiff's laboratory test results, Dr. Tran ordered additional tests and noted that the plaintiff's medication regimen would be gradually tapered. See **Attachment I**. On November 3, 2006, Dr. Tran noted that the plaintiff's clinical status had improved and he again outlined laboratory test results. Dr. Tran did not change the dose of prednisone and noted that he planned to order a work-up for anemia due to the plaintiff's family history of sickle cell disease, his positive screening for the presence of this form of anemia and laboratory test results that evidenced an iron deficiency and consistently low hemoglobin. See **Attachment I**.

16. The plaintiff's hemoglobin level was 7.7 on September 19, 2006, and it increased to 9.7 on November 2, 2006, but dropped to 9.2 on November 3, 2006. On November 28, 2006, Mayo

specialist Emelie Helou evaluated the plaintiff's condition. Dr. Helou noted that the plaintiff was doing well except for 4 to 5 bowel movements per day. Because he had intermittent folliculitis, hyperglycemia and anemia, Dr. Helou recommended tapering prednisone by 5 milligrams per week, discontinuing sulfasalzine because it was ineffective and initiating treatment with Asacol. Dr. Helou noted that the plaintiff's symptoms improved while he received prednisone but that he also had received the medication "for some time" and tapering prednisone was recommended. Dr. Helou also noted that the plaintiff had received iron supplementation to treat anemia and that his blood sugar level was mildly elevated. Dr. Kamath also evaluated Dr. Helou's recommendations on November 28, 2006, and he also agreed with the plan to taper steroids and to prescribe Asacol because the plaintiff's condition had improved. See **Attachment J**. Based on the recommendations by Dr. Helou and Dr. Kamath, Dr. Tran began to taper the plaintiff's dose of prednisone on December 1, 2006. Prior to that time, the plaintiff received prednisone (40 mg per day) as prescribed by Dr. Tran from July 17, 2006, to December 1, 2006.

17. After the plaintiff developed a fever, his condition was assessed by PA Sullivan on December 5, 2006. The plaintiff did not report any significant deterioration of his bowel condition, but Sullivan was concerned about a flare up of colitis. Tylenol was prescribed for the plaintiff, and the fever condition resolved. Laboratory test results reported on December 5, 2006, revealed a hemoglobin level of 11.7 and the December 6, 2006, hemoglobin level was 11.6. On December 21, 2006, the plaintiff told Dr. Tran that his stools had formed better, and Dr. Tran noted that the plaintiff was "doing well" at that time. Dr. Tran reviewed the results of laboratory test results obtained on November 3, 2006, December 5, 2006, and December 11, 2006 and continued to taper prednisone due to his concerns about intermittent folliculitis, hyperglycemia and anemia. However, he also noted that the prednisone taper could be held up if the plaintiff again experienced increased symptoms of colitis. See **Attachment K**. Sullivan also assessed the plaintiff's condition on January 3, 2007, after the plaintiff complained of abdominal discomfort. Sullivan noted that he had a lengthy discussion with the plaintiff about the need to continue the prednisone taper recommended by Dr. Helou and Dr. Kamath.

18. On February 7, 2007, the plaintiff was confined in the Special Housing Unit (SHU) at the FMC because he assaulted an employee and he refused to obey an order. Specifically, the plaintiff was ordered to leave the inmate commissary by an employee, but he refused to obey the order. Employees engaged in an emergency use of force to subdue the plaintiff, and he injured an employee during the use of force incident. The plaintiff received a disciplinary hearing in March 2007, and admitted he refused to obey an order. The disciplinary hearing officer (DHO) who conducted the hearing determined that the plaintiff had committed prohibited acts that involved refusing an order and assaulting another person. The DHO imposed sanctions that included loss of good conduct time, 30 days of confinement in disciplinary segregation and restriction of commissary privileges.

19. During the time frame when the plaintiff was confined in the SHU, department heads, medical care providers and PA Sullivan regularly toured the SHU to speak with inmates and to evaluate the conditions of confinement in the SHU. On February 7, 2007, the plaintiff received

5

treatment from Mayo specialists Dr. Erin Thackeray and Dr. Wyatt Decker for a right shoulder dislocation. The shoulder dislocation was repaired, and Mayo specialist Dr. Michael Torchia recommended an additional consultation in five or six weeks to assess shoulder instability. On February 12, 2007, the plaintiff told PA Sullivan that he experienced increased rectal bleeding and diarrhea. Sullivan noted that the plaintiff complained about symptoms of colitis, but he did not appear to be in distress. Laboratory test results reported on February 13, 2007, revealed the plaintiff's hemoglobin level was 11.8. Dr. Tran dictated a progress note on February 22, 2007, and noted that the plaintiff's condition had been assessed by Sullivan while the plaintiff was confined in the SHU. Dr. Tran continued to recommend a taper of prednisone, and he also noted the results of the laboratory test reported on February 13, 2007. See **Attachment L.** The plaintiff also received an evaluation by Mayo specialist Dr. Justin Strickland on February 22, 2007. Dr. Strickland noted that the shoulder was intact, and the plaintiff was provided with range of motion exercises to perform to improve the condition of his shoulder.

20. Dr. Tran assessed the plaintiff's condition again on March 2, 2007. Although the plaintiff reported that he had some rectal bleeding, he did not report any significant physical changes or problems. The plaintiff had received Asacol to improve his clinical control for complications of colitis. In a progress note entry for March 5, 2007, Dr. Tran noted that he would consider additional follow up by a Mayo specialist if the plaintiff continued to experience symptoms of chronic colitis. In addition to the tours conducted by department heads and medical care providers including Tran and Sullivan, inmates confined in the SHU also received psychological assessments. During SHU review psychological assessments conducted on February 15, 2007, and March 14, 2007, the plaintiff never requested any assistance from the psychologists for mental health problems. See **Attachment M.**

21. While the plaintiff was confined in the SHU at the FMC on March 20, 2007, PA Sullivan assessed his condition. Sullivan noted that the plaintiff appeared to be anemic. After laboratory test results were obtained on March 20, 2007, that revealed a hemoglobin level of 7.0, Dr. Tran made arrangements for the plaintiff to be hospitalized at a Mayo hospital on March 21, 2007. At the Mayo, the plaintiff told Mayo specialist Dr. Travis Figanbaum that his symptoms worsened after prednisone was tapered from September 2006 to January 2007. Dr. Figanbaum noted that the plaintiff's diarrhea condition could be attributed to rapid tapering of prednisone with sub-therapeutic doses of Imuran, which is basically the same drug as azathioprine. Dr. Figanbaum noted that steroid therapy might be resumed until the plaintiff was "at goal for the Imuran" and then steroid therapy would be tapered off. Mayo specialist Dr. Dawn Francis also agreed with Dr. Figanbaum's recommendations. The plaintiff received a blood transfusion and biopsies were obtained via a flexible sigmoidoscopy on March 22, 2007.

22. On March 23, 2007, Dr. Francis noted the plaintiff responded appropriately to the blood transfusion, but she also outlined a course of future treatment that involved tapering prednisone (60 mg for two weeks, 40 mg for two weeks, 20 mg for two weeks, 10 mg for one week and 5 mg for one week). On March 24, 2007, Dr. Francis noted that the plaintiff received 60 mg of prednisone per day and again recommended that the dose should slowly be tapered over the next

6

eight to ten weeks. See **Attachment N**. During an evaluation by Mayo Clinic specialist Dr. Gregory Kennedy, on March 26, 2007, the plaintiff stated his condition had worsened after he was weaned off steroids to a dose of 25 mg per day in January 2007. The plaintiff agreed to accept surgery to treat his chronic ulcerative colitis condition. On March 27, 2007, Mayo specialist Dr. John Schaffner evaluated the plaintiff's condition and discussed potential surgery with him. On March 28, 2007, Dr. Schaffner noted the plaintiff was happy about the possibility of surgery. On March 30, 2007, Dr. Schaffner noted the plaintiff would receive a blood transfusion due to low hemoglobin. Surgery that involved a laparoscopic-assisted subtotal colectomy with end-ileostomy was performed on April 3, 2007. The pathology report specimen established that the plaintiff had severely active chronic ulcerative colitis. Mayo specialist Dr. Eric Dozois noted that the plaintiff tolerated the surgery well, and he was instructed on how to care for his ileostomy. Dr. Dozois identified chronic steroid use as a problem and recommended completely tapering the plaintiff off prednisone in twenty-five days.
See **Attachment O**.

23. After the plaintiff was transferred back to the FMC from the local hospital, his condition was monitored at the FMC by Dr. Chaitali Mukerjee from April 6, 2007, to April 17, 2007. The plaintiff was again weaned off prednisone, and his condition improved. He gained 50 pounds. Dr. Tran submitted a request for a consult with a Mayo specialist on February 1, 2008, and I reviewed his request on February 5, 2008. The plaintiff received another evaluation by Dr. Dozois on February 28, 2008, to complete the second stage treatment that involved surgery, and on March 4, 2008, a second surgery was performed that involved a completion proctectomy with creation of an ileonanal J pouch and diverting loop ileostomy. Following the March 4, 2008, surgery, Dr. Dozois recommended waiting "approximately three months" for consideration of takedown of the diverting loop ileostomy. Although this takedown procedure was not performed by Dr. Dozois until October 15, 2008, the plaintiff tolerated the takedown procedure well, and Mayo employees noted that the plaintiff's pouch did not leak and was not distorted prior to the time the takedown procedure was performed. After the takedown procedure was performed, the plaintiff recovered, and he was discharged from a local hospital in stable condition. See **Attachment P**.

24. The plaintiff submitted an inmate request to staff member form to me on February 9, 2007, in which he requested that another physician should be assigned to monitor his care because he believed Dr. Tran was "not doing all he could be doing." I responded to the plaintiff on February 22, 2007, and advised him that Dr. Tran was his assigned physician and he needed to work with him. At that time, I was not aware of any deficiencies in the care that the plaintiff received from Dr. Tran, PA Sullivan or Mayo specialists who provided care for the plaintiff. Dr. Tran completed his residency in internal medicine and he was familiar with diagnosis and treatment of gastrointestinal diseases. In addition, Mayo specialists Dr. Helou and Dr. Kamath assessed the plaintiff's condition on November 28, 2006, and they recommended tapering prednisone for the plaintiff. In addition, PA Sullivan and other medical care providers regularly toured the SHU to assess the plaintiff's conditions of confinement and his condition. I was not aware of any departure from the applicable standard of care for treatment of colitis with

7

prednisone or the plaintiff's general medical care, and I was not aware of any specific deficiency in the care provided for the plaintiff by Dr. Tran and PA Sullivan..

25. On February 27, 2007, the plaintiff sent another inmate request to me in which he complained that he had only received one treatment for colitis in the 10 month period following his transfer to the FMC. He again wrote that he could not work with Dr. Tran in a positive manner. He wrote that Dr. Tran told him he was not a specialist and there was nothing he could do for the plaintiff. I responded to the plaintiff on March 7, 2007, and advised him that he had been followed regularly by Dr. Tran, PA Sullivan and by Mayo specialists. Even though the plaintiff expressed dissatisfaction with his care and treatment while he was confined at the FMC, I was not aware of any specific deficiencies in the care and treatment that Dr. Tran and PA Sullivan provided for the plaintiff. I personally toured the SHU on March 2 and March 9, 2007, and I never was aware of any specific deficiencies in the plaintiff's care on those days. Dr. Tran arranged for the plaintiff's condition to be evaluated by specialists, and he complied with their recommendations to taper prednisone. In addition, Dr. Tran ordered laboratory tests, and he evaluated the plaintiff's laboratory test results. He prescribed medication to treat colitis and diarrhea, and he prescribed ferrous gluconate to treat iron deficiency. I was not aware of any departure from the applicable standard of care by Dr. Tran, PA Sullivan or Mayo specialists for treatment of complications of colitis at the time the plaintiff submitted the above inmate request to me.

26. Following the plaintiff's hospitalization and the surgery he received for colitis on April 3, 2007, I monitored his condition while he was confined in the local hospital. The plaintiff submitted another inmate request to me on April 22, 2007, in which he requested compensation for denial and delay of the most effective medical treatment. I responded to him on May 4, 2007, and advised him he could not obtain compensation in that manner.

27. Unfortunately, on September 14, 2007, the plaintiff received an incident report for engaging in a prohibited act that involved assaulting another inmate by throwing hot water on him. The plaintiff received a DHO hearing on September 25, 2007, and the DHO imposed disciplinary sanctions on the plaintiff after the plaintiff admitted he had engaged in prohibited conduct. The plaintiff was confined in the SHU on September 15, 2007, and he received a SHU review psychological assessment on October 3, 2007. At that time, the plaintiff reported that he felt "wonderful", and his mood was described as euphoric. See **Attachment Q**.

28. The takedown procedure the plaintiff received on October 15, 2008, did not involve a surgical procedure caused by inadequate treatment by Dr. Tran or PA Sullivan. After the plaintiff was hospitalized on March 21, 2007, he received treatment with prednisone as prescribed by Mayo specialists. On March 27, 2007, Mayo specialist Dr. Mark Schaffner specifically noted that the plaintiff's colitis did not respond well to treatment with intravenous steroids. After steroid treatment was unsuccessful, Dr. Dozois noted on April 2, 2007, that he would recommend a "three-stage approach to the ileo-anal" for the plaintiff due to refractory ulcerative colitis that existed despite aggressive medical therapy. See **Attachment O**. Thus, the



8

April 3, 2007, surgery and as well as the additional surgery procedure performed on March 4, 2008, and the takedown procedure performed on October 15, 2008, involved medically appropriate procedures implemented after aggressive steroid therapy failed. After Dr. Tran retired from federal employment, the plaintiff's care was monitored at the FMC by Dr. Jesus Serrano, who noted on September 26, 2008, that the plaintiff appeared well and did not complain about cramps or pain.

29. After the plaintiff received his takedown procedure on October 15, 2008, he received another incident report on December 4, 2008, for engaging in prohibited conduct that involved assaulting another inmate by kicking him and hitting him with his fists. The plaintiff received a DHO hearing on December 23, 2008, and the DHO imposed disciplinary sanctions on the plaintiff. Additionally, the plaintiff engaged in a fight with another inmate at the FMC on February 1, 2009. He was confined in administrative detention status in the SHU at the FMC on February 2, 2009, and he received a hearing before a DHO on March 12, 2009. Although the plaintiff initially denied that he engaged in a fight, he subsequently admitted to an investigator that he engaged in a fight with another inmate. Following the hearing, the DHO determined that the plaintiff had committed a prohibited act that involved fighting with another inmate, and the DHO imposed sanctions on the plaintiff.

30. Based on my professional knowledge, training and experience as well as my review of the care provided for the plaintiff following his transfer to the FMC, I believe to a reasonable degree of medical certainty and probability that tapering of prednisone that occurred while the plaintiff was under the care of Dr. Tran and Mayo specialists complied with the standard of care. I also believe to a reasonable degree of medical certainty and probability that the plaintiff received medically appropriate care prior to April 3, 2007, when he received the subtotal colectomy with end ileostomy.

31. Treatment of chronic ulcerative colitis with prednisone requires a difficult risk/benefit analysis due to the fact that long-term use of prednisone may cause significant, adverse side effects. Dr. Tran exercised appropriate professional judgment when he tapered prednisone based on the recommendations of Mayo specialists. The plaintiff's hospitalization and blood transfusion on March 21, 2007, were caused by anemia and were not based on any deficiencies in the care he received from Dr. Tran and PA Sullivan. The surgery the plaintiff consented to receive on April 3, 2007, was a known complication of colitis because he had failed to respond to treatment with a variety of medications as well as aggressive treatment with steroids prior to the surgery. Additionally, the plaintiff's quality of life improved because he recovered well from the surgery and gained weight. I also believe to a reasonable degree of medical certainty and probability that no departure from the standard of care occurred merely because the takedown procedure was performed on October 15, 2008, rather than in June or July 2008.

32. I was never deliberately indifferent to the plaintiff's serious medical care need for treatment of colitis. As a supervisor for Dr. Tran and PA Sullivan, I was never aware that they engaged in any acts or omissions tantamount to deliberate indifference to the plaintiff's serious medical care

9

need for diagnosis and treatment of colitis. Further, I believe that the injuries for which the plaintiff requested compensation were not caused by any deliberate indifference to his serious medical care needs by Dr. Tran or PA Sullivan.

Executed this 27th day of May 2010.

*[signature]*

Shelley Stanton, M.D.
Federal Medical Center
Rochester, Minnesota