UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

LAWRENCE STACKHOUSE,                          CIVIL NO. 09-839 (PJS/JSM)

     Plaintiff,                          **REPORT AND RECOMMENDATION**

v.

UNITED STATES OF AMERICA, et al.,

     Defendant.

JANIE S. MAYERON, United States Magistrate Judge.

     The above matter came before the undersigned United States Magistrate Judge upon plaintiff's Motion for Request to Execute Demand Affidavit for Expert Review [Docket No. 29]; defendant's Motion to Dismiss, or Alternatively, for Summary Judgment [Docket No. 30]; and plaintiff's Motion of Expert Identification/Disclosure Executed [Docket No. 41].  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation by the District Court pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1(a).

## I.  BACKGROUND

     On April 13, 2009, Lawrence Stackhouse ("Stackhouse") initiated this action by filing a self-styled "Motion for Jury Trial."  See Docket No. 1 ("Complaint").  At the time Stackhouse commenced this action, he was a prisoner at the Federal Medical Center in Rochester, Minnesota ("FMC-Rochester"). The Complaint alleged the following: On May 2, 2006, Stackhouse was transferred to FMC-Rochester for treatment of ulcerative colitis.  See Complaint, p. 2.  He had been diagnosed with ulcerative colitis while at the

Federal Correctional Institution in Williamsburg, South Carolina ("FCI-Williamsburg"). Id. Prior to his arrival to FMC-Rochester, Stackhouse was prescribed with prednisone, which is a drug used to reduce inflammation. Id. Upon his arrival, Stackhouse completed a medical intake form, indicating all of the prescriptions he was taking, including prednisone. Id.; see also Exhibits attached to Complaint ("Pl. Exhibits") [Docket No. 1-1] at p. 8 of 31. During his medical intake interview, Stackhouse was told that he would immediately be taken off prednisone. Id., p. 2. This decision was made with no detailed review of Stackhouse's medical records and with no physical examination. Id.

A week later, Bureau of Prisons ("BOP") physician and Stackhouse's primary physician at FMC-Rochester, Dr. Trung Tran ("Dr. Tran"), told Stackhouse that he was taken off prednisone because he wanted to have Stackhouse examined by a specialist. Id. Stackhouse did not meet with a specialist until on or about July 10, 2006. Id. The specialist diagnosed Stackhouse with colitis and prescribed him prednisone. Id., p. 3. Stackhouse was further delayed treatment because Dr. Tran was on vacation for two weeks. Id. Stackhouse was given prednisone, after he complained to A.W. Vienyard, and in August 2006, Stackhouse underwent a colonoscopy, which showed that prednisone had been prescribed and that the colitis had gone into a dormant state. Id.

In November 2006, Dr. Tran told Stackhouse that he was going to be tapered off of prednisone. Id. The tapering of the prednisone exacerbated Stackhouse's condition and resulted in him experiencing diarrhea, the passing of blood in his stool, abnormal trips to the bathroom, excessive weight loss, dehydration and sleepless nights. Id. By the time he was completely taken off prednisone, Stackhouse had lost 70 pounds. Id.

He was so weak from dehydration and the loss of blood, he felt he was dying, and he was often too weak to perform the functions necessary to take care of himself.  Id.

After multiple complaints to Physician Assistant Sullivan ("P.A. Sullivan") and Dr. Tran to obtain some relief, Dr. Tran told Stackhouse "[t]his is not my specialty, I can't do anything."  Id., p. 4.  Stackhouse claimed Dr. Tran's changing of his medication regimen when Dr. Tran admitted this was not his specialty and his failure to seek the proper expertise to treat Stackhouse, demonstrated deliberate indifference to Stackhouse's health, and caused him undue harm and cruel and unusual punishment.  Id.

On or about February 2007, Stackhouse filed a complaint with Dr. Shelly Stanton ("Dr. Stanton"), the chief medical practitioner at FMC-Rochester, in which Stackhouse asked for a new physician.  Id.; see also Pl. Exhibits [Docket No. 1-1] at p. 16 of 31 (February 9, 2007 Inmate Request to Staff).  Dr. Stanton replied that Dr. Tran was Stackhouse's doctor and that Stackhouse would need to work with him.  Id.  Stackhouse alleged that Dr. Stanton's denial of his request "shows medical malpractice, and clear deliberate indifference. . . ."  Complaint, p. 4.  Stackhouse also asserted that Dr. Stanton's denial of his second request in March 2007 further displayed deliberate indifference.  Id.

On March 22, 2007, Stackhouse was taken to the Mayo Clinic because his hemoglobin was low and he needed a blood transfusion.  Id., pp. 4-5.  This loss of blood was the result of his exacerbated condition, which Stackhouse asserted was the result of improper treatment.  Id., p. 5.  While in the hospital, Stackhouse was administered intravenous medications, including prednisone.  Id.  After more than a week of the use of the medication, it was determined that his colon was too damaged and that the medications were no longer working to control the inflammation.  Id.

3

Stackhouse was referred to a surgeon who recommended the removal of Stackhouse's large intestine and colon. Id. According to the surgeon, the surgery is normally a two-part procedure over a period of three months, but given the condition of Stackhouse's colon, he was required to undergo a three-part surgery over a period of 12 months. Id. The first surgery occurred on April 4, 2007; the second surgery took place on March 4, 2008; and the third surgery was supposed to have occurred in June 2008. Id. However, when Dr. Tran had retired, he failed to tell anyone about the third surgery and Dr. Stanton failed to properly manage the transition of her staff, which resulted in the third surgery not taking place until October 15, 2008. Id., pp. 5-6.

As a result of these actions, Stackhouse claims that he suffered pain, suffering and sleepless nights over a 29-month period and the loss of a major organ. Id., p. 6. Stackhouse asked for a monetary award in the amount of $7.0 million dollars. Id.

In lieu of an answer, defendants brought a motion to dismiss and in the alternative, a motion for summary judgment. Defendants (the United States of America, the BOP, Dr. Stanton, Dr. Tran, P.A. Sullivan and A.W. Vinyard) have submitted that Stackhouse's case should be dismissed on numerous grounds, including: (1) Stackhouse failed to specifically plead the basis of this Court's subject matter jurisdiction; (2) sovereign immunity bars any constitutional claims against all of the defendants, except for federal employees in their individual capacities; (3) this Court lacks jurisdiction over Dr. Tran, P.A. Sullivan and A.W. Vienyard because they have not been properly served in this action; (4) Stackhouse failed to exhaust administrative remedies on any issues as to P.A. Sullivan and for any complaints regarding his medical care after May 31, 2007, as required by the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e; (5) Stackhouse failed to state a claim of deliberate

indifference under the Eighth Amendment; (6) defendants are entitled to qualified immunity as it relates to any constitutional claim; (7) allegations of constitutional violations against Stanton and Vienyard must be dismissed because the doctrine of respondeat superior is not applicable to <u>Bivens</u> actions; (8) Stackhouse failed to state the proper parties as it relates to his Federal Tort Claim Act ("FTCA") claim; (9) Stackhouse failed to exhaust remedies, as it pertains to some his claims under the FTCA; and (10) Stackhouse's FTCA claims should be dismissed because he failed to provide the prerequisite expert disclosures under Minnesota law. <u>See</u> Federal Defendant's Memorandum in Support of Motion to Dismiss, Alternatively for Summary Judgment ("Defs.' Mem.") [Docket No. 18] at pp. 20-44.

## II.   STANDARD OF REVIEW

Defendants have brought a motion to dismiss or in the alternative, a motion for summary judgment.  As a general rule, materials outside the pleadings cannot be considered on a motion to dismiss, although a court may consider the complaint, matters of public record, orders, materials embraced by the complaint, and exhibits attached to the complaint in deciding a motion to dismiss.  <u>See</u> <u>Porous Media Corp. v. Pall Corp.</u>, 186 F.3d 1077, 1079 (8th Cir. 1999); Fed. R. Civ. P. 10(c) ("A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes."). Here, both parties have submitted materials outside of the pleadings for the Court's consideration.  <u>See</u> Docket Nos. 32-35 (Declarations of Dennis Bitz, Michael Nelson, Shelley Stanton and Mary Jo Madigon); 38 (Narrative of Dr. Laran Lerner).  Therefore, this Court analyzes defendants' motion under the standard of review applicable to a motion for summary judgment.  <u>See</u> Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by

the court, the motion must be treated as one for summary judgment under Rule 56."); see also McAuley v. Federal Ins. Co., 500 F.3d 784, 787 (8th Cir. 2007) ("We have previously held that 'Rule 12(b)(6) itself provides that when matters outside the pleadings are presented and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56.' Such 'matters outside the pleadings' include both statements of counsel at oral argument raising new facts not alleged in the pleadings, and 'any written or oral evidence in support of or in opposition to the pleading that provide some substantiation for and does not merely reiterate what is said in the pleadings.'" Gibb v. Scott, 958 F.2d 814, 816 (1992) (quoting 5C Wright & Miller, Federal Practice and Procedure § 1366) (internal citations omitted)).

Summary judgment is proper when, drawing all reasonable inferences in favor of the non-moving party, there is no genuine issue of any material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. 56; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).  The moving party bears the burden of showing that there are no genuine issues of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  If the moving party carries its burden, the nonmoving party must point to specific facts in the record that create a genuine issue for trial.  Anderson, 477 U.S. at 256.  The non-moving party must "substantiate his allegations with sufficient probative evidence that would permit a finding in [their] favor based on more than mere speculation, conjecture, or fantasy."  Wilson v. Int'l. Bus. Mach. Corp., 62 F.3d 237, 241 (8th Cir. 1995).

III.    **ANALYSIS**

A.    **Motion to Dismiss for a Lack of Personal Jurisdiction**

Defendants argued that pursuant to Rules 12(b)(2) and 12(b)(5) of the Federal Rules of Civil Procedure, Stackhouse's claims against Dr. Tran, P.A. Sullivan and A.W. Vienyard in their individual capacities should be dismissed because they have not been properly served in this action.  See Defs.' Mem. at pp. 23-25.  According to defendants, in a Bivens action,[1] where Stackhouse is suing them in their individual capacities, he must effectuate service on them personally.  Id. at p. 23.  In response, Stackhouse asserted that the U.S. Marshals did their best to serve these defendants, and given his present circumstances, he has no other means to effect service.  See Plaintiff's Motion to Respond, and Reply to Defendants Memorandum to Dismiss or Alternatively for Summary Judgment ("Pl. Mem."), p. 2 [Docket No. 40].[2]

Under the Federal Rules of Civil Procedure, improper service of process may be grounds for dismissal.  See Fed. R. Civ. P. 12(b)(5).  The burden of establishing the validity of service of process falls on the plaintiff.  See Northrup King Co. v. Compania Productora Semillas Algodoneras Selectas, S.A., 51 F.3d 1383, 1387 (8th Cir. 1995)

---

[1]    "A Bivens claim is a cause of action brought directly under the United States Constitution against a federal official acting in his or her individual capacity for violations of constitutionally protected rights."  Buford v. Runyon, 160 F.3d 1199, 1203 n. 6 (8th Cir. 1998) (citing Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971)).

[2]    In their Reply, defendants acknowledged service of Stackhouse's responsive brief, but argued that because he had not filed it with the Court, their motion was unopposed except for Stackhouse's Motion for Expert Review/Opinion (attaching Narrative of Dr. Lerner).  Defendants' Reply Memorandum in Support of Motion to Dismiss or, Alternatively for Summary Judgment ("Defs. Reply"), p. 2.  Stackhouse sent his Response to the undersigned's chambers on or about September 21, 2010, the Response was received on October 1, 2010 and filed by chambers with the Clerk of Court on October 25, 2010.  Therefore, the Court has treated the Response as timely filed and has considered it in full in connection with defendants' motion.

(citation omitted).  "Proper service of process is necessary because, '[i]f a defendant is improperly served, a federal court lacks jurisdiction over the defendant.'" Redding v. Hanlon, Civil No. 06-4575 (DWF/RLE), 2008 WL 762078 at *5 (D. Minn. Mar. 19, 2008) (citing Printed Media Services, Inc. v. Solna Web, Inc., 11 F.3d 838, 843 (8th Cir. 1993), citing Dodco, Inc. v. American Bonding Co., 7 F.3d 1387, 1388 (8th Cir. 1993); Murphy Bros., Inc. v. Michetti Pipe Stringing, 526 U.S. 344, 350 (1999); Sieg v. Karnes, 693 F.2d 803, 807 (8th Cir. 1982); Personalized Brokerage Services, LLC v. Lucius, 2006 WL 2975308 at *1 (D. Minn. Oct. 16, 2006)).

Pursuant to Rules 4(c) and 4(m), a plaintiff is responsible for service of the summons and complaint upon defendant within 120 days after the filing of the complaint.  Rule 4(m) provides in relevant part:

> If a defendant is not served within 120 days after the complaint is filed, the court – on motion or on its own after notice to the plaintiff – must dismiss the action without prejudice against that defendant or order that service be made within a specified time.  But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period. This subdivision (m) does not apply to service in a foreign country under Rule 4(f) or 4(j)(1).

Fed. R. Civ. P. 4(m).

"Because Bivens actions are filed against federal officers in their individual capacities, Plaintiff was required to serve the individual defendants in the manner prescribed by Federal Rule of Civil Procedure 4(e)."  Rasor v. Federal Bureau of Prisons, NO. CIV.05-981(DWF/FLN), 2006 WL 1174221 at *3 (D. Minn. May 01, 2006) (citing Fed. R. Civ. P. 4(i)(2)(B));[3] see also Simpkins v. District of Columbia Gov', 108

---

[3]       In 2006, when Rasor was decided, Fed. R. Civ. P. 4(i)(2)(B) provided:

F.3d 366, 369 (D.C. Cir. 1997) (defendants in <u>Bivens</u> actions must be served as individuals, pursuant to Rule 4(e)).   Under the Rule 4 of the Federal Rules of Civil Procedure, service may be effectuated on an individual by:

> (A) delivering a copy of the summons and of the complaint to the individual personally;
>
> (B) leaving a copy of each at the individual's dwelling or usual place of abode with someone of suitable age and discretion who resides there. . . .

Fed. R. Civ. P. 4 (e)(2)(A), (B).   In lieu of service a plaintiff may request a waiver of service pursuant to the procedures listed in Rule 4(d).   Fed. R. Civ. P. 4(d).

In addition, Rule 4(e)(1) provides that service of process can be effected upon individuals, "following state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located or where service is made."   Pursuant to Minnesota law, "a plaintiff may effectively serve a summons and complaint by two methods: personally under Minn. R. Civ. P. 4.03 or acknowledgment by mail under Minn. R. Civ. P. 4.05." <u>Turek v. ASP of Moorhead, Inc.</u>, 618 N.W.2d 609, 611 (Minn. Ct. App. 2000), <u>rev</u>. <u>denied</u> (Minn. Jan. 26, 2001).   However, "[s]ervice of process in a manner not authorized by the rule is ineffective service." <u>Id</u>. (quoting <u>Lundgren v. Green</u>, 592 N.W.2d 888, 890 (Minn. Ct. App. 1999), <u>rev</u>. <u>denied</u> (Minn. July

---

> Service on an officer or employee of the United States sued in an individual capacity for acts or omissions occurring in connection with the performance of duties on behalf of the United States-whether or not the officer or employee is sued also in an official capacity-is effected by serving the United States in the manner prescribed by Rule 4(i)(1) and by serving the office or employee in the manner prescribed by Rule 4(e), (f), or (g).

Fed. R. Civ. P. 4(i)(3) is now the operative Rule and is virtually identical to the 2006 Rule.

28, 1999), quoting <u>Tullis v. Federated Mutual Ins. Co.</u>, 570 N.W.2d 309, 311 (Minn. 1997)).

In this case, the Complaint was filed with the Court on April 13, 2009. <u>See</u> Docket No. 1. Multiple summons were issued to Stackhouse on April 16, 2009 for service on the defendants. On August 25, 2009, this Court issued an Order finding that service had not been effectuated on defendants and that 120 days had passed since the filing of the Complaint. <u>See</u> August 25, 2009 Order [Docket No. 4]. The Court gave Stackhouse until September 15, 2009, to file a written response, showing good cause why this action should not be dismissed pursuant to Fed. R. Civ. P. 4(m). <u>Id.</u> On September 14, 2009, Stackhouse filed a motion for extension to serve defendants. <u>See</u> Docket No. 5. On September 23, 2009, this Court, in granting some relief to Stackhouse, ordered:

> Plaintiff shall have to and including October 30, 2009, to serve defendants with his Complaint or to show good cause why this Court should excuse his apparent failure to comply with Rule 4(m) by this date. If plaintiff does not serve defendants with his Complaint by October 30, 2009, or file such a response showing good cause for his failure to comply with Rule 4(m) by this date, he will be deemed to have abandoned this action, and the Court will recommend that this action be summarily dismissed, without prejudice, pursuant to Fed. R. Civ. P. 4(m) and 41(b).

September 23, 2009 Order [Docket No. 6].

At Stackhouse's request, the Court ordered the United States Marshal to assist him with service of process, and subsequently gave him two extensions to return the completed summonses to the U.S. Marshal for service. <u>See</u> Docket Nos. 8, 9, 11, 13. Service was effectuated on Dr. Stanton, the BOP and the United States of America. <u>See</u> Docket No. 16. Service was returned as unexecuted as it pertained to defendants P.A. Sullivan, Dr. Tran and A.W. Vienyard. <u>See</u> Docket No 17. There is no evidence of

Stackhouse attempting to serve P.A. Sullivan, Dr. Tran and A.W. Vienyard following the U.S. Marshal's return of service as unexecuted, and Stackhouse conceded in his Response that he was unable to serve these defendants.

Given that Stackhouse failed to provide this Court with any additional cause to excuse his failure to comply with Rule 4(m) and this Court has already provided him with an extension well over the 120 days to effectuate service, the Court concludes that his suit against defendants P.A. Sullivan, Dr. Tran and A.W. Vienyard in their individual capacities should be dismissed without prejudice pursuant to Rule 4(c) and 4(m) for failure to timely serve these defendants.

**B.     Sovereign Immunity Bars Plaintiff's Constitutional Claims as to All Defendants, Except Employees in Their Individual Capacities**

Defendants asserted that the constitutional claims against the United States of America, the BOP and the individual defendants in their official capacities should be dismissed based on the doctrine of sovereign immunity.  See Defs.' Mem. at pp. 21-23. This Court agrees.

"Federal sovereign immunity deprives a court of subject matter jurisdiction." Cooke v. Stanton, Civil File No. 08-1175 (MJD/JJK), 2009 WL 424537 at * 4 (D. Minn. Feb. 18, 2009) (citing Riley v. United States, 486 F.3d 1030, 1031-32 (8th Cir. 2007)). Federal Rule of Civil Procedure 12(b)(1) permits a defendant to file a motion to dismiss for "lack of jurisdiction over the subject matter."  It is the plaintiff's burden to establish that jurisdiction exists.  Osborn v. United States, 918 F.2d 724, 730 (8th Cir.1990).  If the motion to dismiss under Rule 12(b)(1) is based on a deficiency in the pleadings, the "standard of review is the same standard we apply in Rule 12(b)(6) cases." Stalley v. Catholic Health Initiatives, 509 F.3d 517, 521 (8th Cir. 2007) (citing Mattes v. ABC Plastics, Inc., 323 F.3d 695, 697-98 (8th Cir. 2003).  Under this standard, the Court

"accept[s] as true all factual allegations in the complaint, giving no effect to conclusory allegations of law. The plaintiff must assert facts that affirmatively and plausibly suggest that the pleader has the right he claims (here, the right to jurisdiction), rather than facts that are merely consistent with such a right." Id. (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007)).

To the extent that Stackhouse is alleging that the individual defendants in their individual capacities have violated his constitutional rights, he may do so as he is asserting a Bivens claim against them.   See Buford, 160 F.3d at 1203 n. 6 (8th Cir. 1998).

However, to the extent the Stackhouse is seeking redress against the individual defendants for violations of the Constitution in their official capacities, he cannot do so. This is because a claim against government officials in their official capacities is the same as bringing an action against the United States, which cannot proceed because of sovereign immunity.   See Searcy v. Donelson, 204 F.3d 797, 798 (8th Cir. 2000). Similarly, Stackhouse cannot assert a claims against the United States or the BOP, as an agency of Unites States, under the doctrine of sovereign immunity. See Buford, 160 F.3d at 1203 ("It is well settled that a Bivens action cannot be prosecuted against the United States and its agencies because of sovereign immunity.") (citing Laswell v. Brown, 683 F.2d 261, 268 (8th Cir. 1982)).

As such, defendants' motion to dismiss as it relates to Stackhouse's constitutional claims against the United States, the BOP and the only remaining

individual defendant, Dr. Stanton in her official capacity, should be granted and the claims denied with prejudice.[4]

## C.   **Exhaustion of Administrative Remedies**

### 1.   Exhaustion as it Relates to Bivens Claims

Defendants argued that Stackhouse has not exhausted his administrative remedies as to P.A. Sullivan and for any complaints regarding the medical care Stackhouse received after May 31, 2007.  See Defs.' Mem. at pp. 25-27.

Section 1997e(a), which was enacted in 1996 as part of the Prison Litigation Reform Act of 1995, ("the PLRA"), provides:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

This statute requires that prisoners must exhaust all of their available administrative remedies before they can bring a civil rights action based on the conditions of their imprisonment.  "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes," Porter v. Nussle, 534 U.S. 516, 524, 532 (2002), and regardless of the nature of the claim or the relief the prisoner is seeking.  See Booth v. Churner, 532 U.S. 731, 741 (2001).  Exhaustion under the PLRA requires "proper exhaustion," which "demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings."  Woodford v. Ngo, 548 U.S. 81, 90-91

---

[4]     While this Court has no jurisdiction over the individual defendants Stackhouse has yet to serve (P.A. Sullivan, Dr. Tran and A.W. Vienyard), should he effectuate service upon them, he is forewarned that he can only sue them in their individual capacities.

(2006) (emphasis added).   In other words, "proper exhaustion" of administrative remedies, "means using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits)." Id. at 90 (quotation and marks omitted).

As to the purpose of this requirement, the Eighth Circuit has explained:

> Beyond doubt, Congress enacted § 1997e(a) to reduce the quantity and improve the quality of prisoner suits; to this purpose, Congress afforded corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.  In some instances, corrective action taken in response to an inmate's grievance might improve prison administration and satisfy the inmate, thereby obviating the need for litigation.  In other instances, the internal review might filter out some frivolous claims.  And for cases ultimately brought to court, adjudication could be facilitated by an administrative record that clarifies the contours of the controversy.

Johnson v. Jones, 340 F.3d 624, 626-27 (8th Cir. 2003); see also Woodford, 548 U.S. at 89 ("Exhaustion of administrative remedies serves two main purposes.   First, exhaustion protects 'administrative agency authority.'  Exhaustion gives an agency 'an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court,' and it discourages 'disregard of [the agency's] procedures.'   Second, exhaustion promotes efficiency.") (quotation and citations omitted).   However, under the PLRA, failure to exhaust the available administrative remedies is an affirmative defense, with the burden of proof falling on defendant, and not a matter of subject matter jurisdiction. Lenz v. Wade, 490 F.3d 991, 993 n. 2 (8th Cir. 2007) (citing Jones v. Bock, 549 U.S. 199, 127 S.Ct. 910, 919-922 (2007)); see also Nixon v. Sanders, No. 06-1013, 2007 WL 2349344 at *1 (8th Cir. Aug. 17, 2007).

If it is established that exhaustion of administrative remedies did not occur prior to filing of the suit, both the Supreme Court and Eighth Circuit have made it clear that

dismissal is mandatory.  Jones, 549 U.S. at 211 ("There is no question that exhaustion [of administrative remedies] is mandatory under the PLRA and that unexhausted claims cannot be brought in court.");  Woodford, 548 U.S. at 85 ("Exhaustion is no longer left to the discretion of the district court, but is mandatory.");  Johnson, 340 F.3d at 627-28 (finding that if a prisoner does not exhaust his administrative remedies before filing a complaint in federal court, "dismissal is mandatory," and even if a prisoner subsequently satisfies the exhaustion requirement while his action is still pending, the case still must be dismissed).

The BOP provides a comprehensive and multi-tier administrative remedy procedure for federal inmates seeking to address grievances relating to their confinement, codified at Title 28 C.F.R. §§ 542.10 - 542.18.[5]

On February 9, 2007, Stackhouse submitted an Inmate Request to Staff to Dr. Stanton stating that he was under the care of Dr. Tran since he arrived at FMC-Rochester and that under Dr. Tran's care, his condition was getting worse.  See Declaration of Dennis Bitz ("Bitz Decl."), Ex C-1.  Stackhouse believed that Dr. Tran was

---

[5]     Under the BOP's Administrative Remedy Program, the inmate must first present his concern informally to an appropriate staff member, who must attempt to resolve the concern.  See 28 C.F.R. § 542.13(a).  If the issue cannot be resolved informally, the inmate must then file an Administrative Remedy Request by submitting a BP-9 form to the staff member designated by the BOP, generally the warden.  See 28 C.F.R. §§ 542.14(a).  The deadline for submitting the informal resolution and submission of the Administrative Remedy Request is "20 calendar days following the date on which the basis for the Request occurred."  Id.  If dissatisfied with the warden's response, the inmate may appeal the response to the Regional Director by filing a BP-10 form within 20 days of the date the warden signs the response.  See 28 C.F.R. §542.15(a).  If dissatisfied with the Regional Director's response, the inmate must file an appeal with the Office of General Counsel by submitting a BP-11 form within 30 days of the Regional Director's response.  Id.  At that point, the administrative appeal process is completed and suit can then be brought.  Id.  Subject to certain exceptions, BOP regulations dictate that the warden must respond to the inmate's initial grievance within 20 calendar days; the Regional Director must respond within 30 calendar days; and the General Counsel must respond within 40 calendar days.  See 28 C.F.R. § 542.18.

not doing all he could to treat him and he asked that he be given a different doctor.  Id.

On February 22, 2007, Dr. Stanton responded to Stackhouse that Dr. Tran was his

doctor and that he needed to work with Dr. Tran.  Id.  On February 27, 2007,

Stackhouse submitted another Inmate Request to Staff to Dr. Stanton stating he has

received only one treatment since arriving at FMC-Rochester, and that he had to write

to another staff member to receive that treatment.  Id., Ex. C-3.  On March 7, 2007, Dr.

Stanton responded that she had reviewed Stackhouse's records and that he had been

evaluated by GI specialists and followed regularly by Dr. Tran and P.A. Sullivan.  Id.  Dr.

Stanton let Stackhouse know that if he was having any problems he could discuss the

issue with medical staff during their rounds.  Id.  On April 22, 2007, Stackhouse

submitted an Inmate Request to Staff to Dr. Stanton providing: "[m]y claims of denial

and delay of receiving the most effective medical treatment are well documented.  I

hereby request compensation for the pain, suffering, risk, and effect of the denial and

delay."  See Declaration of Dennis Bitz ("Bitz Decl."), Ex D-3.  On May 4, 2007, Dr.

Stanton responded that Stackhouse could not receive compensation through this

request.  Id.

On May 9, 2007,[6] Stackhouse submitted a Request for Administrative Remedy,

which provided "[m]y claims of denial and delay of receiving the most effective medical

treatment are well documented.  I hereby request compensation for the pain, suffering,

risk, and effect of the denial and delay.  I had initially made the request to Dr. Stanton. .

. ."  Id., Ex. D-2.  According to defendants, this remedy was first rejected because it did

not provide specific information, and then was properly submitted on May 31, 2007.  Id.,

¶ 7.

---

[6]     Defendants state that this Request was filed on May 17, 2007.  Bitz Decl., ¶ 7.
However, Exhibit D-2 at attached to the Bitz Declaration is dated May 9, 2007.

On June 27, 2007, Stackhouse submitted a Regional Administrate Remedy Appeal. <u>Id.</u>, Ex. D-4. The first part of the reason for appeal was not readable, however, the attachment provided:

> Dr. Tran, took me off of Prednisone in 11-2006. Which my colon became extremely inflamed, as a result, I was rushed to the hospital 3-21-07, because of a loss of blood and had to have a blood transfusion. I then had to undergo major surgery and [sic] have my colon removed and now having a ileostomy. I've wrote complaints to A.W. Vienyard in 7-2006, as well as clinical directors Dr. Stanton in 2-2007, explaining the denial of receiving timely, and effective medical treatment. I request that any necessary procedure be performed so that reliance on external devices can be eliminated, ileostomy. As well as, the remedy I seek, compensation for the loss of a major body organ, my colon, along with my pain, and suffering. ($$$$$$$)

<u>Id.</u>, Ex. D-5.

On July 26, 2007, the Regional Director responded to the appeal. <u>Id.</u>, Ex. D-6. The Regional Director concluded that the BOP and Mayo Clinic medical providers had taken appropriate measures to treat Stackhouse's chronic condition. <u>Id.</u> According to the Regional Director, any monetary damages claimed must be filed pursuant to the FTCA. <u>Id.</u>

On August 15, 2007, Stackhouse filed a Central Office Administrative Remedy Appeal, responding to the regional appeal decision. <u>Id.</u>, Ex. D-7. On September 12, 2007, the Administrator for National Inmate Appeals issued a decision on Stackhouse's appeal. <u>Id.</u>, Ex. D-8. The decision found that there "was no clinical indication which would indicate [Stackhouse] did not receive proper medical care and treatment for [his] ulcerative colitis condition." <u>Id.</u> The decision also notified Stackhouse that his request for monetary compensation was not viable through the administrative remedy process. <u>Id.</u>

Defendants do not contend that Stackhouse completely failed to exhaust his administrative remedies. Rather, their argument is confined to P.A. Sullivan, who they claim was not mentioned in any of Stackhouse's remedy requests, and as to any issues raised by Stackhouse regarding his care after May 31, 2007. See Defs.' Mem. at p. 27; Bitz Decl., ¶ 7. Stackhouse conceded that he "did not suffer any injury after May 31, 2007." Pl.'s Mem., p. 9. The reason he discussed the care he received after May 31, 2007 in his Complaint, was "to notify the courts of the inconvenience, disregard and inadequate health care medical staff at FMC Rochester displayed." Id.

This Court agrees with defendants' assertion that any claims for relief addressing events after May 31, 2007 are barred as Stackhouse never grieved those events. Consequently, Stackhouse's allegations in his Complaint that the third surgery was improperly delayed from June to October 15, 2008, because Dr. Tran had retired and had failed to apprise anyone of the procedure, and that Dr. Stanton had failed to properly manage the transition of her staff, are barred for failure to exhaust. [7]

---

[7]     Regarding P.A. Sullivan, the "PLRA requires exhaustion of 'such administrative remedies as are available,' 42 U.S.C. § 1997e(a), but nothing in the statute imposes a 'name all defendants' requirement." Jones v. Bock, 549 U.S. 199, 217 (2007). In making this finding, the Supreme Court rejected the Sixth Circuit's dismissal of a prisoners' suit because they had failed to identify in their initial grievance each defendant they later sued. Id. (citation omitted). According to the Supreme Court:

> to properly exhaust administrative remedies prisoners must "complete the administrative review process in accordance with the applicable procedural rules," [ ] rules that are defined not by the PLRA, but by the prison grievance process itself. Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to "properly exhaust." The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion. As MDOC's procedures make no mention of naming particular officials, the Sixth Circuit's rule

Having determined that Stackhouse has not exhausted all available administrative remedies as to any of his claims bearing on actions and conduct occurring after May 31, 2007, any claim arising from this conduct must be dismissed. The only remaining issue for this Court to consider is whether the action should be dismissed with or without prejudice. Prior to <u>Woodford</u>, when a case was dismissed pursuant to 42 U.S.C. § 1997e(a) because of the inmate's failure to exhaust

---

imposing such a prerequisite to proper exhaustion is unwarranted.

<u>Id.</u> at 218 (quoting <u>Woodford</u>, 548 U.S. at 88).

In this case, the applicable regulations 28 C.F.R. §§ 542.13-.15 and the forms used for the BOP grievance process do not specify that the inmate must identify all those involved with a claim. Stackhouse alleged in his Complaint that he made multiple attempts to treat his condition with P.A. Sullivan to no avail and his grievances asserted that the delay of receiving the most effective care led to his present state. This Court concludes that P.A. Sullivan's actions are subsumed within his grievances and that the failure to specifically name him in the grievance process is not fatal to a claim by Stackhouse against him. Nevertheless, this is a moot point as to the <u>Bivens</u> claim against P.A. Sullivan, because this Court is recommending he be dismissed for failure to serve process on him. However, the Court's finding that P.A. Sullivan's actions are subsumed within the grievance is germane to any surviving FTCA claim against the Unites States that is based on any actions by P.A. Sullivan. <u>See</u> <u>Porter</u>, 534 U.S. at 532 ("[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."); <u>Booth</u>, 532 U.S. at 741 n. 6 ("[A]n inmate must exhaust irrespective of the forms of relief sought and offered through administrative avenues."); <u>Banks v. One or More Unknown Named Confidential Informants of Federal Prison Camp Canaan</u>, NO. 1:06-CV-1127, 2008 WL 2563355 at *3-4 (M.D. Pa. June 24, 2008) (finding that the PLRA applied to a prisoner FTCA claim).

That is not to say that satisfying the exhaustion claims under the PLRA satisfies the exhaustion requirement under the FTCA; it is only to say that a prisoner must satisfy both statutes' exhaustion requirements prior to proceeding with a claim before a court.[8]

This Court notes that two-step inquiry for determining the applicability of qualified immunity, as set forth in <u>Saucier</u>, is not regarded as mandatory in all cases. <u>Pearson v. Callahan</u>, 555 U.S. 223, 129 S.Ct. 808, 818 (2009). However, the sequence is "often appropriate," and courts "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." <u>Id.</u> This Court finds that the sequence set forth in <u>Saucier</u> to be appropriate for its analysis in this case.

administrative remedies, it was dismissed without prejudice.  See Harris v. Kemna, 155 Fed. Appx. 941 (8th Cir. 2005) (unpublished opinion); Nash v. Lappin, 155 Fed. Appx. 941, 703 (8th Cir. 2006) (unpublished opinion).

But now, because the time has run on Stackhouse's ability to grieve his complaints regarding defendants' actions after May 2007, Woodford makes clear that the remedies are no longer available.  The BOP's Administrative Remedy Program applies to all BOP inmates and former inmates for issues that arose during their confinement.  See 28 C.F.R. § 542.10(b).  Any attempt by Stackhouse to pursue his administrative remedies following dismissal of this suit, are procedurally barred as the various time periods for initiating a claim and appealing a denial have long since past. See 28 C.F.R. §§ 542.14(a) (for example, the deadline for completion of informal resolution and submission of the Administrative Remedy Request is "20 calendar days following the date on which the basis for the Request occurred.").  Thus, because Stackhouse can no longer exhaust his claims for conduct occurring after May 2007, he has procedurally defaulted on them and his suit is precluded forever and must be dismissed with prejudice.  See Woodford, 548 U.S. at 92-93; Johnson v. Meadows, 418 F.3d 1152, 1156 (11th Cir. 2005) (noting the "policies favoring exhaustion," court held that the PLRA contains a procedural default component where an inmate fails to avail himself in a timely fashion of the institution's administrative process); Berry v. Kerik, 366 F.3d 85, 88 (2d Cir. 2004) ("[F]ailure to pursue administrative remedies while they were available precluded [the plaintiff's] federal lawsuits, and they were properly dismissed with prejudice.").

Therefore, defendants' motion for summary judgment, as it relates to claims against Dr. Stanton in her individual capacity arising out of conduct occurring after May 31, 2007, should be granted and the claims dismissed with prejudice.

### 2. Exhaustion as it Relates to FTCA Claim

Defendants argued that while Stackhouse refers to negligent conduct in his Complaint that occurred while he was confined at FMC-Rochester from May 2, 2006, up to and including October 15, 2008, when he received his third surgery, his FTCA administrative claim only addresses the period of time from May 2, 2006, up to and including his first surgery on April 4, 2007. See Defs.' Mem. at p. 39. As a result, because the FTCA administrative claim filed by Stackhouse did not provide any notice of his claim concerning negligent care received from April 5, 2007 to October 15, 2008, he has not fully complied with the exhaustion requirement of 28 U.S.C. § 2675(a). Id. Stackhouse did not directly respond to this argument, but, as stated previously, he has acknowledged that he lost a bodily organ on April 4, 2007 and has not suffered any injury since May 31, 2007. See Pl.'s Mem. at pp. 8-9.

"The FTCA is a limited waiver of sovereign immunity which requires compliance with the conditions enacted by Congress." Bellecourt v. United States, 994 F.2d 427, 430 (8th Cir. 1993). "These conditions are construed narrowly . . . ," and include the restriction that a person may not bring an action in federal court for money damages under the FTCA until a "sum certain" claim has been presented to the appropriate federal agency in writing, and the agency has denied the claim. Id. (citing 28 U.S.C. § 2675(a)). "Presentment of an administrative claim is jurisdictional and must be pleaded and proven by the FTCA claimant." Id. (citations omitted). Thus, before a party can

pursue a claim against the United States, that person must exhaust his or her administrative remedies.

Regulations promulgated pursuant to the FTCA provide that a claim is presented "when a Federal agency receives from a claimant . . . an executed Standard Form 95 or other written notification of an incident, accompanied by a claim for money damages in a sum certain for injury to or loss of property, personal injury, or death." 28 C.F.R. § 14.2(a); see also Ahmed v. United States, 30 F.3d 514, 516-17 (4th Cir. 1994) (quoting Adkins v. United States, 896 F.2d 1324, 1326 (11th Cir. 1990)) (finding that "[t]his provision has been interpreted by the courts to indicate that the claimant meets his burden if the notice (1) is sufficient to enable the agency to investigate and (2) places a 'sum certain' value on her claim.'").

Stackhouse submitted a Standard Form 95 prescribed by the Department of Justice for a claim of damages. See Bitz Decl., Ex. A-1. Stackhouse's FTCA administrative claim only addresses the period of time from May 2, 2006, when he arrived at FMC-Rochester, up to and his ileostomy surgery on April 4, 2007. Id., Ex. A-1-2. Consequently, this Court finds that while Stackhouse exhausted his FTCA administrative remedies relating to his medical treatment up to his ileostomy surgery on April 4, 2007, his failure to address the events and conduct surrounding his allegedly deficient medical care after this date leads to the conclusion that he did not exhaust his FTCA administrative remedies with respect to any medical negligence claim asserted in his Complaint occurring after April 5, 2007. Further, since over two years have passed since the events between April 5, 2007 through October 15, 2008, Stackhouse's FTCA claims arising out of these events should be dismissed with prejudice for a failure to exhaust FTCA administrative remedies. See 28 U.S.C. § 2401(b) ("A tort claim against

the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues. . . .").

### D.   __Qualified Immunity__

Defendants asserted that Stackhouse has failed to adequately state a claim under the Eighth Amendment and even if he did, they are entitled to qualified immunity on the claim.  <u>See</u> Defs.' Mem. at pp. 27-35.  Given that only Dr. Stanton remains as a defendant with regards to Stackhouse's Eighth Amendment claim, the Court limits its analysis to his claims against her occurring before June 1, 2007.

"'Government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  <u>Winters v. Adams</u>, 254 F.3d 758, 766 (8th Cir. 2001) (quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982)).  "The doctrine 'gives ample room for mistaken judgments but does not protect the plainly incompetent or those who knowingly violate the law.'"  <u>Bagby v. Brondhaver</u>, 98 F.3d 1096, 1098 (8th Cir. 1996) (quoting <u>Ludwig v. Anderson</u>, 54 F.3d 465, 470 (8th Cir. 1995); <u>Malley v. Briggs</u>, 475 U.S. 335 (1986)); <u>see also</u> <u>Saucier v. Katz</u>, 533 U.S. 194, 205 (2001) (stating that "[i]f the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense").  "This accommodation for reasonable error exists because 'officials should not err always on the side of caution' because they fear being sued."  <u>Hunter v. Bryant</u>, 502 U.S. 224, 229 (1991) (quoting <u>Davis v. Scherer</u>, 468 U.S. 183, 195 (1984)). "The obvious function of the qualified immunity rule is to excuse an officer who makes a reasonable mistake in the exercise of his official duties."  <u>Edwards v. Baer</u>, 863 F.2d 606, 607 (8th Cir. 1988).

"[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, assessed in the light of the legal rules that were 'clearly established' at the time it was taken." Wilson v. Layne, 526 U.S. 603, 614 (1999) (quoting Anderson v. Creighton, 483 U.S. 635, 639 (1987)). "The lynchpin of qualified immunity is the public official's objective reasonableness." Bagby, 98 F.3d at 1098 (emphasis in original).

The applicability of the qualified immunity doctrine is a question of law and, when qualified immunity is raised as a defense, courts generally analyze the application of qualified immunity by first addressing "whether the allegations amount to a constitutional violation, and then, whether that right was clearly established." Sanders v. City of Minneapolis, Minnesota, 474 F.3d 523, 526 (8th Cir. 2007) (citing Saucier, 533 U.S. at, 201);[8] see also Tyler v. Barton, 901 F.2d 689, 691 (8th Cir. 1990) (applying these factors to prison officials).

The Eighth Amendment to the United States Constitution prohibits the government from inflicting "cruel and unusual punishments" on those convicted of crimes. See Rhodes v. Chapman, 452 U.S. 337, 344-46 (1981). The prohibition against "cruel and unusual punishments" is violated by the "unnecessary and wanton

---

[8]     This Court notes that two-step inquiry for determining the applicability of qualified immunity, as set forth in Saucier, is not regarded as mandatory in all cases. Pearson v. Callahan, 555 U.S. 223, 129 S.Ct. 808, 818 (2009). However, the sequence is "often appropriate," and courts "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Id. This Court finds that the sequence set forth in Saucier to be appropriate for its analysis in this case.

infliction of pain contrary to contemporary standards of decency." Helling v. McKinney, 509 U.S. 25, 32 (1993) (citation omitted).

"It is well established that '[d]eliberate indifference to a prisoner's serious medical needs is cruel and unusual punishment in violation of the Eighth Amendment.'" Langford v. Norris, 614 F.3d 445, 459-60 (8th Cir. 2010) (quoting Gordon ex rel. Gordon v. Frank, 454 F.3d 858, 862 (8th Cir. 2006), citing Estelle v. Gamble, 429 U.S. 97, 106 (1976)).

Deliberate indifference has both an objective and subjective component: plaintiffs must demonstrate that they suffered objectively serious medical needs and that the prison officials "actually knew of but deliberately disregarded those needs." Dulaney v. Carnahan, 132 F.3d 1234, 1239 (8th Cir. 1997) (citation omitted); see also Langford, 614 F.3d at 460 ("To show deliberate indifference, plaintiffs must prove an objectively serious medical need and that prison officials knew of the need but deliberately disregarded it.") (citations and marks omitted).

As to the objective component, a "serious medical need [is] one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." Camberos v. Branstad, 73 F.3d 174, 176 (8th Cir. 1995) (marks and citation omitted).

Regarding the subjective component, "[i]t is only such indifference that can offend 'evolving standards of decency' in violation of the Eighth Amendment." Estelle, 429 U.S. at 106.

"A complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." Estelle, 429 U.S. at 106; see also Wilson v. Seiter, 501 U.S. 294, 297-99

(1991) (concluding that claims of inadvertent failure to provide adequate medical care do not establish deliberate indifference); Langford, 614 F.3d at 460 ("To state a claim based on "inadequate medical treatment . . . [t]he plaintiff 'must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation.'") (quoting Alberson v. Norris, 458 F.3d 762, 765 (8th Cir. 2006), quoting Estate of Rosenberg v. Crandell, 56 F.3d 35, 37 (8th Cir. 1995)); Smith v. Clarke, 458 F.3d 720, 724 (8th Cir. 2006) ("Malpractice alone is not actionable under the eighth amendment.") (citing Estelle, 429 U.S. at 106); Dulaney, 132 F.3d at 1242 (concluding that incompetent or inadequate medical care does not rise to the level of a constitutional violation unless such care is so inappropriate as to demonstrate intentional maltreatment or a refusal to provide essential care).

In addition, evidence that only raises questions of medical judgment does not meet the requirement of deliberate indifference.  See Noll v. Petrovsky, 828 F.2d 461, 462 (8th Cir. 1987).  Similarly, failure to treat a medical condition does not violate the Eighth Amendment unless it was known that such a condition created an excessive risk to the inmate's health and there was a deliberate failure to act on such knowledge. Dulaney, 132 F.3d at 1239 (citing Long v. Nix, 86 F.3d 761, 765 (8th Cir. 1996)).  As long as this threshold is not crossed, inmates have no constitutional right to receive a particular or requested course of treatment, and prison doctors remain free to exercise their independent medical judgment.  Long, 86 F.3d at 765.

Applying these principals to the undisputed facts in the record, this Court finds as a matter of law that Dr. Stanton's conduct did not violate the Eighth Amendment.

Dr. Stanton assumed the duties of Clinical Director for FMC-Rochester on October 15, 2006, a position she held until January 17, 2009. <u>See</u> Declaration of Shelley Stanton, M.D. ("Stanton Decl."), ¶ 2. In her role as Clinical Director, Dr. Stanton was responsible for the general supervision of Dr. Tran and medical providers at FMC-Rochester from October 15, 2006, until her departure from this position in January 2009. <u>Id.</u>, ¶ 3. Stackhouse was confined at FMC-Rochester from May 2, 2006 to March 17, 2009. <u>Id.</u>

When Stackhouse was at FCI-Williamsburg, he was diagnosed with ulcerative colitis and prescribed with prednisone on April 11, 2006 at 60 milligrams per day for ten days and then 40 mg per day for one month. Stanton Decl., Exs. A, B. The stop date listed for prednisone was listed a May 4, 2006. <u>Id.</u>, Ex. B-2 (Medical Summary of Prisoner/Alien in Transit); <u>see also</u> Complaint, Pl. Exhibits [Docket No. 1-1] at p. 8 of 31. Prednisone is a medication used to treat inflammation. <u>See</u> Stanton Decl., ¶ 7. Its initial dose is to be maintained until a satisfactory response is noted and then reduced at small increments until the lowest dosage that provides an adequate response is reached. <u>Id.</u> Prednisone may be used to treat ulcerative colitis, however, the medication may cause severe side effects, which must be monitored and weighed against the benefits that the medication can provide. <u>Id.</u>, ¶ 8.

During his intake at FMC-Rochester on May 4, 2006, physician Dr. Richard Ashley ("Dr. Ashley") noted that Stackhouse had lost over 30 pounds over a five-month period. <u>Id.</u>, Ex. C-9. Other than his colitis, Dr. Ashley found Stackhouse to be stable and healthy. <u>Id.</u>, Ex. C-10. Dr. Ashley indicated that Stackhouse was to continue taking sulfasalazine, which is used to treat colitis, and ranitidine, which is used to treat

duodenal or gastric ulcers, however no additional steroids were prescribed. Id., ¶¶ 9-10, Ex. C-10.

Dr. Tran first met with Stackhouse on May 9, 2006. Id., ¶ 10. Dr. Tran stated in his treatment note that Stackhouse had been transferred to FMC-Rochester for further evaluation of bloody diarrhea and a recent diagnosis of colitis. Id., Ex. D-1. Dr. Tran noted that Stackhouse had initially been treated with prednisone, flagyl (used to treat abdominal infections) and ranitidine, with some improvement, but that he was on sulfasalazine, and loperamide (used to control diarrhea). Id. Stackhouse reported to Dr. Tran that his symptoms had improved, but that perhaps he could benefit from an antibiotic. Id., Ex. D-2. Dr. Tran ordered blood tests, an abdominal x-ray and prescribed sulfasalazine, loperamide, flagyl and ranitidine. Id., Ex. D-3. On the same date, Dr. Tran put in a request for a consultation specialist from the Mayo Clinic in order to evaluate Stackhouse. Id., Ex. E-1. The request for the consultation was granted by FMC-Rochester Clinic Director David Edward on May 16, 2006. Id. Despite the fact that the consultation was approved, the Mayo Clinic specialists were independent contractors who establish their own date and time when they are available to see inmates confined at FMC-Rochester. Id., ¶ 12.

On June 7, 2006, Stackhouse reported to Dr. Tran that he still was having frequent loose stools. Id., Ex. F-1. Dr. Tran noted that Stackhouse had gained four pounds since arriving at FMC-Rochester. Id. The specimen slides of a colon biopsy obtained in South Carolina had been reviewed by the Mayo Clinic with a pathology diagnosis of moderate active colitis. Id. Dr. Tran did not change Stackhouse's medications at this time. Id., Ex. F-2.

On July 3, 2006, Stackhouse reported an increase in the number of his stools, but that he had run out of loperamide.  Id., Ex. F-1.  His prescription for loperamide was refilled.  Id., Ex. F-3.  On July 10, 2006, Stackhouse reported blood in his stool and some vomiting.  Id.  Stackhouse also provided that he had 40 mg prednisone tablets in his possession, that he was taking one a day for one week and reported feeling somewhat better.  Id.

On July 11, 2006, Stackhouse had a gastroenterology consult with Dr. Patrick Kamath ("Dr. Kamath") from the Mayo Clinic.  Id., ¶ 12.  Dr. Kamath's impression was that plaintiff was suffering from inflammatory bowl disease, most likely ulcerative colitis.  Id., Ex. G.  Dr. Kamath noted that it was important to determine the extent and nature of his disease.  Id.  Dr. Kamath found that Stackhouse's symptoms appeared to be disproportionate to previous colonoscopy findings.  Id.  Dr. Kamath noted that a determination would need to be made as to what treatment Stackhouse should get and whether there was an indication for surgery.  Dr. Kamath recommended that Stackhouse continue with prednisone, 40 mg daily, and that he undergo a colonoscopy.  Id.  Stackhouse told him that he was not very happy with the care he had received "thus far."  Id.

On July 12, 2006, Stackhouse made a request to see Dr. Tran, but was told that he was on vacation and that he could sign up for sick call.  Id., Ex. F-4.  Stackhouse refused to do so and complained about the care he was receiving.  On July 13, 2006, Dr. Tran entered a progress note, which provided that Stackhouse appeared angry for not having yet received prednisone.  Id., Ex. H-1.  Dr. Tran noted that the prednisone had been discontinued because there was a possibility that Stackhouse was suffering from more than ulcerative colitis and because he had just received an intensive dose.

Id.   Dr. Tran followed Dr. Kamath's recommendation and placed Stackhouse on prednisone at 40 mg by mouth daily.   Id., Ex. H-2-H-3; see also Complaint, Pl. Exhibits [Docket No. 1-1] at pp. 9-10 of 31.

On July 18, 2006, Dr. Tran entered a note specifying that he had told Stackhouse to start taking prednisone again, but that he appeared to have taken an excessive amount of the medication and suffered prednisone related psychosis.   Stanton Decl., Ex. H-3; see also Complaint, Pl. Exhibits [Docket No. 1-1] at p. 10 of 31.   Stackhouse admitted to taking an excessive amount and that it had an adverse effect.   Id.   Dr. Tran noted that Stackhouse had taken the correct dose of prednisone in the morning. Stanton Decl., Ex. H-4; see also Complaint, Pl. Exhibits [Docket No. 1-1] at p. 11 of 31. No new problems were noted.   Id.   Dr. Tran indicated that Stackhouse was to continue taking his medications, and undergo general tests and a colonoscopy, followed by a Mayo gastroenterology follow-up.   Id.

The colonoscopy conducted on August 24, 2006, showed mildly active pancolonic ulcerative colitis.   Stanton Decl., Ex. I-1.

On September 18, 2006, Dr. Tran requested a gastroenterology follow-up for Stackhouse following a colonoscopy.   Id., Ex. I-4.   On the same day, Stackhouse saw Dr. Tran.   Stackhouse claimed that everything appeared to be fine, that he felt great and experienced no abdominal pain, his stool had become more solid and that he was taking less loperamide.   Id., Ex. I-5; see also Complaint, Pl. Exhibits [Docket No. 1-1] at p. 13 of 31.   Dr. Tran found Stackhouse to be "in excellent physical condition, no complaints as when he first came to FMC Rochester."   Stanton Decl., Ex. I-3.

On November 3, 2006, Dr. Tran noted that Stackhouse had a mild apprehensive abdominal feeling but no pain or tenderness.   Id., Ex. I-5.   Stackhouse had been taking

his medications, his weight was stable and his hemoglobin was 9.7 g/dl.  Dr. Tran noted that Stackhouse displayed an improved clinical status.  Id.  Dr. Tran also noted that Stackhouse should continue with his treatment, an anemia work up would done (due to family history of sickle cell anemia) and that Stackhouse had a pending Mayo gastroenterology follow-up on November 28, 2006.  Id.

On November 28, 2006, Mayo Specialist Dr. Emelie Helou ("Dr. Helou") evaluated Stackhouse's condition.  Id., ¶ 16.  Dr. Helou noted that Stackhouse was doing well, except for 4-5 bowl movements per day.  Id., Ex. J-1.  Because Stackhouse was suffering from a rash, hyperglycemia and anemia, Dr. Helou recommended tapering Stackhouse's prednisone by 5 mg per week, discontinuing sulfasalazine because it was ineffective and initiating treatment with Asacol.  Id., J-2.  Dr. Helou noted that while Stackhouse's symptoms improved on prednisone, he had been on the medication for some time and needed to have it tapered.  Id.  Dr. Kamath reviewed Dr. Helou's recommendations and agreed with the plan to taper steroids and prescribe Asacol because Stackhouse's condition had improved.  Id., Ex. J-3.

On December 21, 2006, Dr. Tran reported that Stackhouse had reported that his stool was better forming and that he was otherwise doing well since starting the tapering of his prednisone, as recommended.  Id., Ex. K-2.  Dr. Tran noted that it was recommended that Stackhouse taper his use of prednisone by 5 mg due to intermittent folliculitis, hyperglycemia and anemia.  Id., Ex. K-2; see also Complaint, Pl. Exhibits [Docket No. 1-1] at p. 14 of 31.  Dr. Tran noted that if Stackhouse became symptomatic they could stop the tapering of prednisone.  Stanton Decl., Ex. K-2.

On January 3, 2007, P.A. Sullivan had made a note that he had a lengthy discussion with Stackhouse regarding tapering his prednisone after Stackhouse had made a complaint of abdominal discomfort.  Id.

While Stackhouse was confined in the SHU, department heads, medical care providers and P.A. Sullivan regularly toured the SHU to speak with inmates and to evaluate the conditions of confinement in the SHU.  Stanton Decl., ¶ 24.

On February 9, 2007, Stackhouse submitted an inmate request form to Dr. Stanton requesting that he be assigned another physician because Dr. Tran was not doing all that he could be doing.  Stanton Decl., ¶ 24; see also Complaint, Pl. Exhibits [Docket No. 1-1] at p. 16 of 31; Bitz Decl., Ex. C-1.   Dr. Stanton responded that Stackhouse needed to work with Dr. Tran.   Id.

Dr. Stanton explained:

> At that time, I was not aware of any deficiencies in the care that the plaintiff received from Dr. Tran, PA Sullivan or Mayo specialists who provided care for the plaintiff. Dr. Tran completed his residency in internal medicine and he was familiar with diagnosis and treatment of gastrointestinal diseases. In addition, Mayo specialists Dr. Helou and Dr. Kamath assessed the plaintiff s condition on November 28, 2006, and they recommended tapering prednisone for the plaintiff. In addition, PA Sullivan and other medical care providers regularly toured the SHU to assess the plaintiff's conditions of confinement and his condition. I was not aware of any departure from the applicable standard of care for treatment of colitis with prednisone or the plaintiff's general medical care, and I was not aware of any specific deficiency in the care provided for the plaintiff by Dr. Tran and PA Sullivan.

Stanton Decl., ¶ 24.

On February 12, 2007, Stackhouse reported to P.A. Sullivan that he was experiencing increased rectal bleeding and diarrhea.   Id., Ex. L-1.   P.A. Sullivan reported this to Dr. Tran who ordered labs to be done and to continue with the tapered

prednisone. Id.  On March 5, 2007, Dr. Tran noted that during his rounds in the special housing unit ("SHU"), Stackhouse reported to him that he was experiencing rectal bleeding and that he had lost 50 pounds since January 2007.  Id., Ex. M-1; see also Complaint, Pl. Exhibits [Docket No. 1-1] at p. 20 of 31.  Dr. Tran told Stackhouse to have his weight taken frequently in order to monitor his weight loss and they should conduct another gastroenterology follow-up if he continues to have symptoms of colitis. Stanton Decl., Ex. M-2; see also Complaint, Pl. Exhibits [Docket No. 1-1] at p. 21 of 31. Dr. Tran kept Stackhouse on the same treatment with monitoring.  Stanton Decl., Ex. M-2; see also Complaint, Pl. Exhibits [Docket No. 1-1] at p. 21 of 31.

On February 27, 2007, Stackhouse wrote another inmate request to Dr. Stanton, complaining that he only had received one treatment in his ten months at FMC-Rochester for his colitis and that he was the one to get things going with regards to this treatment.  See Complaint, Pl. Exhibits [Docket No. 1-1] at p. 19 of 31; Stanton Decl, ¶ 25; Bitz Decl., Ex. C-3.  Stackhouse also stated that Dr. Tran told him he was not a specialist and there was nothing he could do for him.  Bitz Decl., Ex. C-4.  Dr. Stanton responded on March 7, 2007, stating that she had reviewed his records and that the records indicated that he had been evaluated by gastroenterology consultants and followed regularly by Dr. Tran and P.A. Sullivan.  See Complaint, Pl. Exhibits [Docket No. 1-1] at p. 19 of 31; Stanton Decl, ¶ 25; Bitz Decl., Ex. C-3.  Dr. Stanton noted that medical staff made rounds twice a day in the SHU, and if Stackhouse was having problems, he could discuss them with the medical staff during the rounds.  See Complaint, Pl. Exhibits [Docket No. 1-1] at p. 19 of 31; Stanton Decl, ¶ 25; Bitz Decl., Ex. C-3.  Dr. Stanton also indicated that she had toured the SHU on March 2 and March 9, 2007, and was never aware of any deficiencies in Stackhouse's care on those days.

<u>See</u> Stanton Aff., ¶ 25.  According to Dr. Stanton, at that time she was not aware of any deficiencies in the care (including the treatment of his colitis), Stackhouse received, stating:

> Dr. Tran arranged for the plaintiff's condition to be evaluated by specialists, and he complied with their recommendations to taper prednisone. In addition, Dr. Tran ordered laboratory tests, and he evaluated the plaintiff's laboratory test results. He prescribed medication to treat colitis and diarrhea, and he prescribed ferrous gluconate to treat iron deficiency. I was not aware of any departure from the applicable standard of care by Dr. Tran, PA Sullivan or Mayo specialists for treatment of complications of colitis at the time the plaintiff submitted the above inmate request to me.

<u>Id.</u>

On March 21, 2007, P.A. Sullivan noted that Stackhouse appeared anemic and found that his hemoglobin had fallen to 7 g/dl.  <u>Id.</u>, Ex. N-1; <u>see also</u> Complaint, Pl. Exhibits [Docket No. 1-1] at p. 23 of 31.  P.A. Sullivan notified Dr. Tran who then notified Dr. Kamath at the Mayo Clinic.  <u>Id.</u>, Ex. N-1-2; <u>see also</u> Complaint, Pl. Exhibits [Docket No. 1-1] at pp. 23-24 of 31.  Stackhouse was then transferred to Saint Mary's Hospital under the care of the Mayo gastroenterology department for a blood transfusion and colonoscopy examination.  Stanton Decl., Ex. N-2; <u>see also</u> Complaint, Pl. Exhibits [Docket No. 1-1] at p. 24 of 31.

While at the Mayo, Stackhouse reported to Dr. Travis Figanbaum ("Dr. Figanbaum"), that as his prednisone was tapered off he was having increased bowl movements and that by January when the steroids were stopped, he was having 20-30 bowl movements a day with blood.  <u>Id.</u>, Ex. N-4.  Dr. Figanbaum noted that the increased diarrhea may be due to rapid tapering of prednisone with sub-therapeutic doses of Imuran.  <u>Id.</u>, Ex. N-5.  Dr. Figanbaum also noted that Stackhouse would need additional steroid therapy until he was at his goal for Imuran and then steroids would be

tapered off.  Id.  Dr. Figanbaum decided that Stackhouse required a blood transfusion due to his low hemoglobin.  Id.  Mayo Specialist, Dr. Dawn Francis ("Dr. Francis"), agreed with Dr. Figanbaum's findings and recommendations.  Id., Ex. N-7-8.  On March 22, 2007, Stackhouse underwent a sigmoidscopy with biopsies, which revealed diffuse colitis.  Id., Ex. N-9.  On March 23, 2007, Dr. Francis noted an improvement in the number of bowl movements Stackhouse was having and recommended switching from Slu-Medrol to oral prednisone at 60 mg per day to be tapered gradually (60 mg for two weeks, 40 mg for two weeks, 20 mg for two weeks, 10 mg for one week and 50 mg for 1 week).  Id., Ex. N-10.  Dr. Francis opined that the colitis flare-up was due to the rapid tapering of prednisone with sub-therapeutic doses of Imuran.  Id., Ex. N-12.  Dr. Francis also noted that Stackhouse responded adequately to the transfusion, but that he continued to be anemic.  Id., Ex. N-10.

On March 26, 2007, Stackhouse saw Dr. Gregory Kennedy at the Mayo Clinic for a colon surgery consult.  Id., Ex. O-1.  Stackhouse reported that he was still having 10 bowel movements per day with some blood, that he was feeling terrible and that he was asking for surgery.  Id.  Surgery options were discussed.  Id., Ex. O-2.  On March 27, 2007, Stackhouse reported to Dr. John Schaffner ("Dr. Schaffner") that he had 12 bowel movements the previous day.  Id., Ex. O-3.  Dr. Schaffner found that Stackhouse's ulcerative colitis was not responding well to steroid use.  Id.  Dr. Schaffner further noted that they would continue with the steroid treatment for a few more days, and if it did not work, they would recommend surgery.  Id.  On March 28, 2007, Stackhouse reported that he was happy about the possibility of surgery, which was scheduled for that following Tuesday.  Id., Ex. O-5, O-8.

On April 2, 2007, Mayo specialist Dr. Eric Dozois ("Dr. Dozois") recommended a three-stage approach to surgery.  Id., Ex. O-13.  On April 3, 2007, Stackhouse had a laproscopic-assisted subtotal colectomy with end-ileostomy.[9]  Id., Ex. O-20, O-24.  The pathology report established that Stackhouse had severe active chronic ulcerative colitis.  Id., Ex. O-23.  As part of the discharge, Stackhouse was placed on prednisone for a 25-day period.  Id., Ex. O-24.  It was reported that Stackhouse had a good recovery from the surgery and that his ileostomy was viable and functioning.  Id.  Dr. Stanton asserted that he monitored Stackhouse's condition while he was in the hospital. Id., ¶ 26.

On April 27, 2007, Stackhouse submitted an Inmate Request to Staff to Dr. Stanton requesting compensation because he claimed he did not received the most effective treatment while at FMC-Rochester.  Id., ¶ 27.  Dr. Stanton responded on May 4, 2007, stating that Stackhouse could not receive compensation through this request. Id.

On October 3, 2007, Stackhouse received a psychological assessment while in the SHU, during which he reported that he felt "wonderful," and his affect was described as euphoric.  Id., Ex. Q.

On February 1, 2008, Dr. Tran submitted a request for a Mayo GI consultation, which was approved by Dr. Stanton on February 5, 2008.  Id., ¶ 23.  On February 28, 2008, Stackhouse saw Mayo specialist Dr. Dozois for an evaluation for the second surgery, during which time Dr. Dozois reported that Stackhouse was doing well and had gained 50 pounds.  Id., Ex. P-1.  On March 4, 2008, the second stage of the surgery

---

[9]     Ileostomy: Establishment of a fistula (opening or passage) through which the ileum (third and lowest portion of the small intestine) discharges directly to the outside of the body.  Stedman's Medical Dictionary, 27th Ed. (2000).

occurred, which created an ileoanal J pouch.  Id., Ex. P-4-6.  While the third surgery, the takedown procedure, did not take place until October 15, 2008, Mayo staff noted that Stackhouse's pouch was not leaking nor was it distorted, and that Stackhouse tolerated the takedown procedure.  Id., Ex. P-19, 21, 24, 31.

Dr. Stanton opined that the tapering of prednisone that occurred while Stackhouse was under the care of Dr. Tran and Mayo specialists complied with the standard of care and that the Stackhouse received medically appropriate care prior to April 3, 2007 (when he received the subtotal colectomy with end ileostomy).  Id., ¶ 30. In addition, Dr. Stanton opined that given the severe side effects from long-term prednisone use, Dr. Tran exercised appropriate professional judgment when he tapered prednisone based on the recommendations of Mayo specialists.  Id., ¶ 31.  Dr. Stanton further opined that the surgery Stackhouse consented to receive on April 3, 2007, was a known complication of colitis because he had failed to respond to treatment with a variety of medications as well as aggressive treatment with steroids prior to the surgery, and that Stackhouse's quality of life improved because he recovered well from the surgery and gained weight.  Id.

Dr. Stanton asserted that she was never deliberately indifferent to Stackhouse's treatment of colitis nor was she aware that either Dr. Tran or P.A. Sullivan were engaged in any acts or omissions tantamount to deliberate indifference to Stackhouse's medical care.  Id., ¶ 32.

Defendants also presented the expert opinion of Dr. Michael Nelson, M.D. ("Dr. Nelson"), the current Clinical Director for the FMC, formerly served as the Regional Medical Director for the North Central Regional Office of the BOP and as the Chief of Health Programs for the BOP.  Based upon his review of Stackhouse's medical records,

Dr. Nelson opined that the failure to immediately continue treatment with prednisone following Stackhouse's transfer to the FMC was not a departure from the applicable standard of care for the treatment of colitis, especially given the recommendation to do so by specialist, and that Dr. Tran provided appropriate medical care and treatment to Stackhouse.  Declaration of Michael Nelson ("Nelson Decl.") ¶¶ 2, 4-5.  According to Dr. Nelson, prednisone is commonly prescribed only to induce remission of symptoms of colitis and then the medication is tapered to the lowest effective dose, as opposed to long-term use due to its many serious side effects.  Id., ¶ 4. Dr. Nelson opined that the standard of care for long-term treatment of colitis generally involves treatment with sulfasalazine, mesalamine, azathioprine and other medications, which are monoclonal antibody inhibitors, in order to control symptoms of the disease and to reduce or eliminate use of prednisone altogether.  Id.  Based on his review of the records, Dr. Nelson concluded that Dr. Tran had ordered appropriate laboratory tests and medications, made appropriate requests for consultations with specialists to diagnose and develop an appropriate course of medical treatment to treat Stackhouse's condition. Id., ¶ 5.  Dr. Nelson noted that those specialists had recommended tapering prednisone several months before Stackhouse was hospitalized in March 2007 and had a blood transfusion.  Id.  Dr. Nelson further opined that the natural progression of patients suffering from ulcerative colitis involves a significant possibility of surgery to treat their disease and thus, the surgical procedures Stackhouse underwent were caused by complications of ulcerative colitis and were not due to treatment by Dr. Tran or by Dr. Stanton's decision to not assign another physician to Stackhouse.  Id., ¶ 6.

Stackhouse also submitted a report by his expert, Laran Lerner, D.O.  Based on his review of medical records and a chronology prepared by Stackhouse, Dr. Lerner

opined that the physicians and other medical practitioners that treated Stackhouse had committed medical malpractice because they deviated from the standard of medical care, leading to undo pain, sleepless nights, severe blood loss (resulting in blood transfusions), untreated colitis, and loss of his large intestine and his rectum.  See Docket No. 38-1.  Dr. Lerner also stated that Stackhouse should have been continued on prednisone, as it was a necessary treatment to reduce his inflammation and colitis, and that Stackhouse should have had the necessary specialty treatment he required. Id.

Based on this record, Stackhouse argued that Dr. Stanton's failure to adequately respond to his complaints regarding the quality of care he was receiving, amounted to deliberate indifference that resulted in his suffering and loss of his large intestine, and that even a brief delay in providing health care, can amount to cruel and unusual punishment.  See Pl.'s Mem. at pp. 6, 12.

Defendants disagreed, submitting that Stackhouse did not provide any evidentiary support for his contention that Dr. Stanton's actions constituted deliberate indifference.  Defendants maintained that the evidence demonstrated that Stackhouse's medical condition was thoroughly evaluated by FMC staff and Mayo specialists, FMC medical staff acted in accordance with the recommendations of Mayo specialists and BOP policy, and defendants provided Stackhouse a level of care in line with the applicable community's standards of care.  See Defs.' Mem. at pp. 31-35.

Dr. Stanton commenced her role as Clinical Director of FMC-Rochester on October 15, 2006, at which time her responsibilities included general supervision of defendants Dr. Tran and P.A. Sullivan, and other medical providers.  Thus, the question before this Court is whether Dr. Stanton's actions constituted deliberate indifference to

Stackhouse's medical needs during the period of October 15, 2006 through May 31, 2007.  The Court concludes that Dr. Stanton's actions do not.

Dr. Stanton's first actual involvement with Stackhouse was on February 9, 2007, when he submitted an inmate request form to her asking that he be assigned to another physician because Dr. Tran was not doing all that he could be doing.  Stanton Decl., ¶ 24; Complaint, Pl. Exhibits [Docket No. 1-1] at p. 16 of 31; Bitz Decl., Ex. C-1.  This request was denied.  Id.  On February 27, 2007, Stackhouse submitted a second inmate request to Dr. Stanton, complaining that he had only received one treatment in his ten months at FMC-Rochester for his colitis, he was the one to get things going with regards to this treatment, and Dr. Tran had told him he was not a specialist and there was nothing Dr. Tran could do for him.  See Complaint, Exhibits [Docket No. 1-1] at p. 19 of 31; Stanton Decl., ¶ 25; Bitz Decl., Ex. C-3.  This request was also denied.  Id.

Dr. Stanton denied these requests because she was not aware of deficiencies in Stackhouse's treatment by Dr. Tran, P.A. Sullivan or Mayo specialists.  Stanton Decl., ¶¶ 24, 25.  In support, Dr. Stanton explained she was not aware of deficiencies in Stackhouse's treatment by Dr. Tran, P.A. Sullivan or the Mayo specialists.  Stanton Decl., ¶¶ 24, 25.  Dr. Stanton indicated that she relied on the fact that Dr. Tran completed his residency in internal medicine and he was familiar with diagnosis and treatment of gastrointestinal diseases.  Id., ¶ 24.  In addition, she noted Dr. Tran set up consultations with specialists and that Mayo Clinic specialists, Dr. Helou and Dr. Kamath, assessed the Stackhouse's condition on November 28, 2006, and recommended tapering prednisone for the plaintiff, which Dr. Tran followed.  Id. ¶¶ 24-25.  Dr. Stanton also provided that P.A. Sullivan and other medical providers regularly toured the SHU to assess Stackhouse's condition and that she herself had toured the

SHU on March 2 and March 9, 2007 and was never aware of any deficiencies in Stackhouse's care on those days.  Id., ¶¶ 24-25.  Further, Dr. Stanton described how Dr. Tran ordered and evaluated laboratory tests for Stackhouse, and prescribed medication to treat his colitis and diarrhea.  Id., ¶ 25.

Dr. Stanton's reasoning for denying Stackhouse's requests is supported by the record.  While Stackhouse was prescribed with prednisone at FCI-Williamsburg, it was only for a ten-day period with a stop date of May 4, 2006.  Stanton Decl., Exs. A, B.  During his intake to FMC-Rochester it was noted that Stackhouse was taking medications for his colitis, other than prednisone—including sulfasalazine.  Id., ¶¶ 9-10, Ex. C-10.

Upon his first consultation with Stackhouse, Dr. Tran prescribed sulfasalazine, and loperamide (used to control diarrhea), ordered blood tests, an abdominal x-ray, and made a request for a consultation specialist from the Mayo Clinic in order to evaluate Stackhouse.  Id., Ex. D1, D-3, E-1.  Stackhouse had a gastroenterology consult with Dr. Kamath of the Mayo Clinic and based on Dr. Kamath's recommendation, Dr. Tran placed Stackhouse on Prednisone.  Id., Exs. G, H-2-H-3.  Stackhouse underwent a colonoscopy on August 24, 2006 and on September 18, 2006, Dr. Tran requested a gastroenterology follow-up for Stackhouse following the colonoscopy.  Id., Ex. I-1-I-4.

On November 28, 2006, Mayo Specialist Dr. Helou evaluated Stackhouse's condition.  Id., ¶ 16.  Dr. Helou noted that Stackhouse was doing well, except for 4-5 bowl movements per day.  Id., Ex. J-1.  Because Stackhouse was suffering from a rash, hyperglycemia and anemia, Dr. Helou recommended tapering Stackhouse's prednisone by 5 mg per week, discontinuing sulfasalazine because it was ineffective and initiating treatment with Asacol (used to treat colitis).  Id., J-2.  Dr. Helou stated that while

Stackhouse's symptoms improved on prednisone, he had been on the medication for some time and needed to have it tapered.  Id.  Dr. Kamath reviewed Dr. Helou's recommendations and agreed with the plan to taper steroids and prescribe Asacol because Stackhouse's condition had improved.  Id., Ex. J-3.  Dr. Tran followed this recommendation with regards to tapering the prednisone with monitoring.  Id., Ex. K-2. Stackhouse reported a loss of weight and increased rectal bleeding and diarrhea after the tapering of prednisone and Dr. Tran ordered tests to be performed and told Stackhouse to monitor his weight loss.  Id., Ex. L-1, M-1, M-2.

While Stackhouse maintains that he should have been kept on prednisone, there is no admissible evidence in the record to support this contention.[10]  For example, none

---

[10]     Stackhouse submitted Dr. Lerner's narrative report for the purpose of meeting the requirements of Minn. Stat. § 145.682 in connection with his FTCA claim. Nevertheless, the Court also considered Dr. Lerner's opinions in connection with Stackhouse's Eighth Amendment claim against Dr. Stanton.  The Court gave no weight to these opinions for several reasons.  As a preliminary matter, Dr. Lerner gave this Court no information regarding his qualifications to render these opinions.  From his report, all the Court could glean was that he offices in Westland, Michigan and is a D.O. (Doctor of Osteopathic Medicine) who is board certified in Physical Medicine,  Docket No. 38-1.  That information is insufficient for this Court to determine if he is qualified to offer opinions on the standard of care and treatment to be provided to patients in Minnesota suffering from colitis.  Additionally, Dr. Lerner did not set out the standard of care against which he was offering his opinions.  Most importantly, Dr. Lerner's opinions are nothing more than broad conclusions with no facts or reasons to explain or support them.  This Court has no idea why Dr. Lerner reached the opinions he did.  In fact, one of his opinions – that Stackhouse "should have had the necessary specialty treatment that he required" – suggests to that Dr. Lerner was not aware of the various consultations received by Stackhouse, including those performed by medical specialists at the Mayo Clinic.  As they currently stand, Dr. Lerner's opinions do not even make out a malpractice claim, which, as discussed earlier, presents a lower standard for liability than the threshold for an Eighth Amendment claim.  See Fabio v. Bellomo, 504 N.W.2d 758, 762 (Minn.1993) ("To establish a prima facie case of medical malpractice, a plaintiff must introduce expert testimony demonstrating (1) the standard of care recognized by the medical community as applicable to the particular defendant, (2) that the defendant departed from that standard, and (3) that the defendant's departure was a direct cause of the plaintiff's injuries."); see also McDonough v. Allina Health Sys., 685 N.W.2d 688, 697 (Minn. Ct. App. 2004) ("To establish the third element, "a plaintiff must

of the medical providers who treated Stackhouse, including Dr. Ashley, the intake physician, Dr. Tran and the various specialists consulted by Dr. Tran (Dr. Kamath, Dr. Helou, Dr. Figanbaum, Dr. Francis, Dr. Kennedy, Dr. Dozois) recommended he stay on prednisone indefinitely.   To the contrary, in addition to Dr. Tran, these providers recommended tapering Stackhouse's use of prednisone and Dr. Tran followed their recommendation.   <u>See</u>, <u>e.g.</u>, Stanton Decl., Exs. C-10, J-1-3, N-5, N-10, O-3, O-24. Further, both Dr. Stanton and Dr. Nelson have opined that the failure to immediately continue treatment with prednisone following Stackhouse's transfer to the FMC was not a departure from the applicable standard of care for the treatment of colitis, especially given the recommendation to do so by specialist, and that Dr. Tran provided appropriate medical care and treatment to him.   <u>See</u> Stanton Decl., ¶¶ 24-25; Nelson Decl. ¶¶ 4-5. Indeed, both Dr. Stanton and Dr. Nelson opined that prednisone is commonly prescribed only to induce remission of symptoms of colitis, then the medication is tapered to the lowest effective dose, as opposed to long-term use due to its many serious side effects, and that other drugs are used for the long-term control of the condition.   <u>See</u> Stanton Decl., ¶¶ 7-8; Nelson Decl. ¶ 4.

This Court has no doubt (and defendants are not suggesting otherwise) that Stackhouse suffered from a serious medical condition that required appropriate medical care.   However, based on the record before this Court, it is satisfied that Stackhouse was receiving appropriate treatment for his colitis from Dr. Tran and the various specialists consulted by Dr. Tran and under the supervision of Dr. Stanton through May 31, 2007.   As such, this Court finds as a matter of law that Dr. Stanton did not deliberately disregard Stackhouse's needs when she refused to change Stackhouse's

---

present competent expert testimony showing that the defendant's action or inaction was a direct cause of the injury.").

doctor or intervene in some other manner, and she is entitled to qualified immunity on Stackhouse's Eighth Amendment claim.[11]

For all of the reasons stated above, defendants' motion for summary judgment as it relates to Stackhouse's <u>Bivens</u> claim against Dr. Stanton for violation of the Eighth Amendment should be granted and the claim dismissed with prejudice.

## E.    Federal Tort Claim Act Claim

"'The Federal Tort Claims Act is a limited waiver of sovereign immunity, making the Federal Government liable to the same extent as a private party for certain torts of federal employees acting within the scope of their employment.'" <u>Audio Odyssey, Ltd. v. United States</u>, 255 F.3d 512, 516 (8th Cir. 2001) (quoting <u>United States v. Orleans</u>, 425 U.S. 807, 813 (1976)).   "Under the FTCA, the United States is liable, as a private

---

[11]    To the extent that Stackhouse is contending that Dr. Stanton is liable to him under the Eighth Amendment because she failed in her duty to supervise Dr. Tran or other providers, this claim cannot proceed.   A <u>Bivens</u> action cannot be premised on respondeat superior liability or a failure to supervise.   Under <u>Bivens</u>, Dr. Stanton can only be liable for her personal acts.   <u>See Buford</u>, 160 F.3d at 1203 n. 7 (citing <u>Estate of Rosenberg v. Crandell</u>, 56 F.3d 35, 37 (8th Cir. 1995)); <u>see also Rizzo v. Goode</u>, 423 U.S. 362, 377 (1976) (rejecting the argument that a supervising public official has an constitutional duty to supervise and discipline so as to prevent violations of constitutional rights by his or her subordinates and that supervising official does not violate a victim's constitutional rights unless he or she has played "an affirmative part" in the alleged misconduct of the subordinates); <u>Brown v. Grabowski</u>, 922 F.2d 1097, 1120 (3rd Cir.), <u>cert. denied</u>, 501 U.S. 1218 (1991) (concluding that mere failure to train and supervise, absent proof of direct participation in the subordinates' conduct, does not form the basis for a constitutional claim) (citation omitted); <u>Chinchello v. Fenton</u>, 805 F.2d 126, 133 (3rd Cir. 1986) (dismissing <u>Bivens</u> claim against the Director of Bureau of Prisons and finding that "while supervising public officials may not in any way authorize, encourage, or approve constitutional torts, they have no affirmative duty to train, supervise or discipline so as to prevent such conduct."); <u>Bellecourt v. United States</u>, 784 F. Supp. 623, 633 (D. Minn. 1992) ("In a <u>Bivens</u> action, a federal official cannot be held vicariously liable for the acts of his subordinates under the doctrine of respondeat superior, unless he was personally involved in or participated in the unconstitutional acts.   Unless plaintiff pleads an 'affirmative link' between the supervisor's 'personal participation, his exercise of control or direction, or his failure to supervise,' dismissal is appropriate.") (internal citations omitted).

person, for 'injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting under the scope of his office or employment.'" Western Nat. Mut. Ins. Co. v. United States, 964 F. Supp. 295, 297 (D. Minn. 1997) (quoting 28 U.S.C. § 1346(b)).  The remedy provided by the FTCA for injuries resulting from the activities of Government employees "is exclusive of any other civil action or proceeding for money damages.'" United States v. Smith, 499 U.S. 160, 161 (1991) (quoting 28 U.S.C. §2679(b)(1)).  Employees of the federal government "may not be sued for torts they commit while acting within the scope of their employment." Knowles v. United States, 91 F.3d 1147, 1150 (8th Cir. 1996) (citation omitted) ("When someone is injured by a tort committed by an employee of the United States who is acting within the scope of his employment, that employee cannot be sued.").  In addition, "[b]ecause a federal agency cannot be sued under the Federal Tort Claims Act, the United States is the proper defendant." Duncan v. Department of Labor, 313 F.3d 445, 447 (8th Cir. 2002) (citing F.D.I.C. v. Meyer, 510 U.S. 471, 476-77(1994)).  Therefore, to the extent that Stackhouse is asserting a claim under the FTCA against the BOP or Dr. Stanton, those claims should be dismissed with prejudice, as the proper defendant is only the United States of America.[12]

Defendants also argued that Stackhouse's FTCA claim fails because he failed to provide the necessary expert affidavits required by Minn. Stat. § 145.682.  This Court agrees.

Claims brought under the FTCA are governed under the substantive law of the state in which the claims arose. 28 U.S.C. § 1346(b).  "A federal prison inmate alleging

---

[12]   If Stackhouse had properly served Dr. Tran, P.A. Sullivan and A.W. Vienyard, this Court would be recommending dismissal of the FTCA claims against them for the same reasons the FTCA claims must be dismissed against the BOP and Dr. Stanton.

medical negligence under the FTCA must abide by § 145.682." Garcia v. Anderson, NO. CIV. 08-4731 (ADM/JJG), 2009 WL 2900304 at *4 (D. Minn. Sept. 2, 2009) (citing Bellecourt, 784 F. Supp. at 627, 636-37; Tineo v. Fed. Bureau of Prisons, Civ. No. 05-724 (ADM/SRN), 2005 WL 1745451 at *2-3 (D. Minn. July 22, 2005)).  Minn. Stat. § 145.682 requires a plaintiff in a medical malpractice case to submit two affidavits.

As to the first affidavit ("expert review affidavit"):

> the plaintiff must . . . serve upon defendant with the summons and complaint an affidavit . . . stat[ing] (a) the facts of the case have been reviewed by the plaintiff's attorney[13] with an expert whose qualifications provide a reasonable expectation that the expert's opinions could be admissible at trial and that, in the opinion of this expert, one or more defendants deviated from the applicable standard of care and by that action caused injury to the plaintiff; or (b) the expert review required by paragraph (a) could not reasonably be obtained before the action was commenced because of the applicable statute of limitations.

Minn. Stat. § 145.682, subds. 2, 3 (emphasis added).

The second affidavit ("expert disclosure affidavit"), which must be served 180 days after the commencement of the suit:

> must be signed by each expert listed in the affidavit and by the plaintiff's attorney and state the identity of each person whom plaintiff expects to call as an expert witness at trial to testify with respect to the issues of malpractice or causation, the substance of the facts and opinions to which the expert is expected to testify, and a summary of the grounds for each opinion.  If an affidavit is executed pursuant to this paragraph, the affidavit in paragraph (a) must be served on defendant or the defendant's counsel within 90 days after service of the summons and complaint.

Minn. Stat. § 145.682, subds. 2, 4 (emphasis added).

---

[13]     If the plaintiff is acting pro se, "the plaintiff shall sign the affidavit" referenced in Minn. Stat. § 145.682, subd. 2, 3 and 4 "and is bound by those provisions as if represented by an attorney."  Minn. Stat. § 145.682, subd. 5.

The penalty for failing to comply with Minn. Stat. § 145.682, subds. 2 and 4 is mandatory dismissal.

> Penalty for noncompliance. (a) Failure to comply with subdivision 2, clause (1), within 60 days after demand for the affidavit results, upon motion, in mandatory dismissal with prejudice of each cause of action as to which expert testimony is necessary to establish a prima facie case.

Minn. Stat. § 145.682, subd. 6.

> With respect to the expert review affidavit, failure to comply within 60 days after demand for the affidavit "results, upon motion, in mandatory dismissal with prejudice of each cause of action as to which expert testimony is necessary to establish a prima facie case." With respect to the expert disclosure affidavit, no demand is necessary to trigger the noncompliance penalties. Rather, the statute simply provides that failure to supply the affidavit within 180 days "results, upon motion, in mandatory dismissal with prejudice of each cause of action as to which expert testimony is necessary to establish a prima facie case."

Bellecourt, 784 F. Supp. at 637 (quoting Minn. Stat. § 145.682, subd. 6).

"The Minnesota legislature enacted Minn. Stat. § 145.682 for the purpose of eliminating nuisance medical malpractice lawsuits by requiring plaintiffs to file affidavits verifying that their allegations of malpractice are well-founded." Stroud v. Hennepin County Medical Center, 556 N.W.2d 552, 555 (Minn. 1996) (citation omitted).

There are two situations where a plaintiff's failure to timely comply with Minn. Stat. § 145.682 may be excused: "(1) if expert testimony is not needed to establish negligence, or (2) if the plaintiff shows excusable neglect in failing to timely serve the affidavits." Garcia, 2009 WL 2900304 at *4 (citing Minn. Stat. § 145.682, subd. 2; Bellecourt, 784 F. Supp. at 636-37)). In order to show excusable neglect, a plaintiff must show that "(1) plaintiff has a reasonable case on the merits; (2) plaintiff has a reasonable excuse for his failure to meet the statutory time limits; (3) plaintiff has

proceeded with due diligence after notice of statutory time limits; and (4) no substantial prejudice will result to defendant by the extension of time." Bellecourt, 784 F. Supp. at 639.

Stackhouse filed his Complaint on April 13, 2009.  See Docket No. 1.  No expert review affidavit was provided with the Complaint.   Service was effectuated on Dr. Stanton on March 10, 2010; on the United States on March 11, 2010; and on the BOP on April 12, 2010.  See Docket No. 18.  On April 5, 2010, counsel for defendants filed a Notice of Appearance.  See Docket No. 14.  On May 28, 2010, defendants served a demand on Stackhouse that he provide them with the expert review affidavit within 60 days and that failure to comply would result in the dismissal of his claims.  See Declaration of Mary Jo Madigan, Ex. A [Docket No. 35].  The Demand also informed Stackhouse:

> Minn. Stat. §145.682 requires that when you served the summons and complaint in a medical malpractice action, you must also provide an affidavit of expert review. This affidavit must state that you have reviewed the facts of your claim with a medical expert whose qualifications provide a reasonable expectation that the expert's opinions could be admissible at trial and that, in the opinion of this expert, one or more of defendant's employees deviated from the applicable standard of care and by that action caused you injury.

Id.

On July 19, 2010, Stackhouse filed a Motion for Request to Execute Demand Affidavit for Expert Review.  See Docket No. 29.  The basis for requesting the extension to serve his expert review affidavit was that he was in lockdown for security issues and could not access a law library.  Id.; see also Pl.'s Mem. at p. 14.  Defendants never responded to this motion.

In connection with his motion for an extension, Stackhouse did not provide this Court with any information as to why he had not produced the required expert review affidavit when he filed the suit in April 2009 or when he served the Complaint a year later.  Similarly, he did not share with the Court the length of time he was in lockdown or any evidence to suggest that he had no access to a law library from May 28, 2010, the date defendants made their demand for the expert review affidavit, until July 19, 2010, when he made his motion.  Further, even if he did not have access to a law library from the end of May 2010 until he filed his motion for an extension, by explaining in their demand the contents of Minn. Stat. §145.682, subd. 3, defendants gave Stackhouse the information he needed to provide in his expert review affidavit.  Based on this record, the Court concludes that Stackhouse did not have a reasonable excuse for not submitting the expert review affidavit at the time he filed the suit in April 2009, and he did not make a diligent effort to provide the affidavit at the commencement of the suit or by the time he served the Complaint on defendants in March and April 2010, or within the 60-day notice period after defendants had made their demand for the affidavit.[14]

In summary, given the lack of evidence of diligence by Stackhouse to produce to defendants the expert review affidavit, and his failure to provide any evidence to support a finding of reasonable excuse for his failure to meet the statutory time limits mandated by Minn. Stat. §145.682, this Court finds no excusable neglect.  Failing to find any excusable neglect, this Court denies Stackhouse's motion to extend the time to provide

---

[14]    In fact, Stackhouse failed to provide any "expert review affidavit" until September 8, 2010, when he served and filed the Narrative Report dated August 23. 2010, by Laran Lerner, D.O, who offices in Westland, Michigan.  See Docket No. 38,  This expert identification lacked any mention of Dr. Lerner's qualifications (except to state below his signature that he is "Board Certified" in "Physical Medicine and Rehabilitation") to "provide a reasonable expectation that [his] opinions could be admissible at trial."  Minn. Stat. §145.682, subd. 3(a).

an expert review affidavit and finds that he has not complied with the mandates of §145.682.[15]

As to the expert disclosure affidavit required by Minn. Stat. §145.682, subd. 4, Stackhouse never did serve such an affidavit on defendants.  Instead, on November 17, 2010, (well after defendants' dispositive motion was fully briefed), Stackhouse filed a Motion of Expert Identification/Disclosure Executed [Docket No. 41].  In this pleading, Stackhouse stated in relevant part:

> Plaintiff has enclosed sufficient information to put the defendants on notice on the proposed expert, Dr. Laran Learner [sic].  Plaintiff would like the record to reflect that on September 8, 2010 plaintiff filed expert review/opinion executed.    Furthermore,  in  this  expert  review/opinion executed, the courts and U.S. Attorney can find (1) specific details, dates, and defendant which in the experts opinion deviated from the applicable standard of care. (2) In this narrative report the courts and U.S. Attorney can find the acts or omissions that plaintiff violated the standard of care, and (3) a short outline which speaks of the violation/mal-practice of the standard of care, and in-result plaintiff's damages.

Plaintiff Motion of Expert Identification/Disclosure Executed, p. 2.  From this pleading, this Court concludes that Stackhouse was designating the Narrative Report by Dr. Lerner that Stackhouse had previously filed on September 8, 2010, as the expert disclosure affidavit required by Minn. Stat. §145.682, subd. 4.

Stackhouse's belated attempt to serve and file an expert disclosure affidavit that comports with Minn. Stat. §145.682, subd. 4, is rejected.  First, the expert disclosure affidavit was not timely as it was not served within 180 days after commencement of the suit.  Second, as discussed above, this Court has no evidence before it to excuse this belated submission.  Third, even if the Narrative Report had been timely served, it is

---

[15]     Additionally, this Court finds that this case requires expert testimony to establish negligence.

woefully inadequate – it does not even begin to meet the requirements dictated by Minn. Stat. §145.682, subd. 4.

In his Narrative Report, Dr. Lerner listed the medical records he had reviewed,[16] and a chronological report from Stackhouse.  Based on the review of these documents, Dr. Lerner opined that Stackhouse has a medical malpractice claim against defendants "as a result of a deviation from the standard of care that he received during his incarceration at the prison."  Docket No. 38-1 (Lerner Narrative Report.)  It was also Dr. Lerner's opinion that Stackhouse should have been continued on prednisone, as it was a necessary treatment to reduce his inflammation and colitis, and he should have had the necessary specialty treatment he required.  Id.  In sum, Dr. Lerner provided that "the records do constitute malpractice."  Id.

As an initial matter, the Narrative Report is not the subject of an affidavit signed by Dr. Lerner and thus, does not meet the requirements of Minn. Stat. §145.682, subd. 4.  In addition, the contents of the Report was completely deficient.  It does not state the substance of any facts from any medical records which Dr. Lerner intends to testify about nor does it contain the required summary of the grounds for each of his opinions. In short, other than stating his conclusory opinions, the narrative contains no information to establish a deviation in the standard of care or causation between the alleged violation of the standard of care and Stackhouse's alleged injuries and damages. Remarkably, Dr. Lerner does not even identify the applicable standard of care against which he is comparing defendants' conduct.  As the Minnesota Supreme Court has found:

---

[16]     No records from the Mayo Clinic were mentioned in the list of medical records reviewed by Dr. Lerner.

> [I]t is not enough for the plaintiff's affidavit of expert
> identification to simply repeat the facts in the hospital or
> clinic record. <u>Id.</u> at 192. "The affidavit should set out how the
> expert will use those facts to arrive at opinions of malpractice
> and causation." <u>Id.</u> We noted that in cases commencing after
> the filing of the <u>Sorenson</u> opinion, plaintiffs would be
> expected to set forth, by affidavit or answers to
> interrogatories, specific details concerning their experts'
> expected testimony, including the applicable standard of
> care, the acts or omissions which the plaintiff alleges
> resulted in a violation of the standard of care, and an outline
> of the chain of causation between the violation of the
> standard of care and the plaintiff's damages. <u>Id.</u> at 193.

<u>Stroud</u>, 556 N.W.2d at 555-56 (quoting <u>Sorenson v. St. Paul Ramsey Med. Ctr.</u>, 457

N.W.2d 188, 192-93 (Minn. 1990)); <u>see also</u> <u>Touisignant v. St. Louis County,</u>

<u>Minnesota</u>, 615 N.W.2d 53, 61 (Minn. 2000) (finding that an expert report that was not

signed by the expert and contained only brief conclusory statements was deficient and

would have required dismissal of the action under Minn. Stat. §145.682) (citing

generally <u>Lindberg v. Health Partners, Inc.</u>, 599 N.W.2d 572, 578 (Minn. 1999)).

In conclusion, Dr. Lerner's Narrative Report does not meet the requirements of

Minn. Stat.  § 145.682 because it was not an affidavit signed by Dr. Lerner, provides no

information on the standard of care to be applied, and contains only provides broad and

conclusory opinions and similarly broad and conclusory statements regarding causation.

<u>See</u> <u>Stroud</u>, 556 N.W.2d at 556 ("In light of <u>Sorenson</u>, it is clear that Dr. Tredal's June

21 affidavit did not meet the requirements of the statute.  The affidavit provides only

broad, conclusory statements as to causation. The affidavit does not provide an outline

of the chain of causation between the alleged violation of the standard of care and the

claimed damages.").  As such, Stackhouse's Motion of Expert Identification/Disclosure

Executed should be denied.

Stackhouse's failure to provide the affidavits mandated by Minn. Stat. § 145.682, is fatal to his claims under the FTCA as he has not complied with the substantive law of the state in which the claims arose.  <u>See</u> 28 U.S.C. § 1346(b).  Therefore, this Court recommends that summary judgment on Stackhouse's FTCA claim against the United States be granted.

## IV.    RECOMMENDATION

For the reasons set forth above, and based on all the files, records, and proceedings herein, IT IS HEREBY RECOMMENDED THAT:

1.    Defendants' Motion to Dismiss, or Alternatively for Summary Judgment [Docket No. 30] be **GRANTED**;

2.    Plaintiff's Complaint be **DISMISSED WITHOUT PREJUDICE** as it relates his claims against defendants Dr. Tran, Physician Assistant Sullivan and A.W. Vienyard in their individual capacities.   The remainder of plaintiff's Complaint should be **DISMISSED WITH PREJUDICE**.

3.    Plaintiff's Motion for Request to Execute Demand Affidavit for Expert Review [Docket No. 29] be **DENIED**.

4.    Plaintiff's Motion of Expert Identification/Disclosure Executed [Docket No. 41] be **DENIED**.

DATED:      February 11, 2011

s/ *Janie S. Mayeron*
JANIE S. MAYERON
United States Magistrate Judge

**NOTICE**

Under D.Minn. LR 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **February 25, 2011**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.   A party may respond to the objecting party's brief within ten days after service thereof.   All briefs filed under this Rule shall be limited to 3500 words.   A judge shall make a de novo determination of those portions to which objection is made.   This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.